[No. H018811. Sixth Dist. Aug. 25, 1999.]

MICHAEL A. NELSON, Plaintiff and Appellant, v.
UNITED TECHNOLOGIES, Defendant and Appellant.

598

---

**COUNSEL**

M. Jean Starcevich for Plaintiff and Appellant.

Rexon, Freedman, Klepetar & Hambleton, Debby R. Hambleton and Ronald Klepetar for Defendant and Appellant.

---

**OPINION**

**ELIA, J.**—After he was fired from his job, Michael A. Nelson sued his former employer, United Technologies Chemical Systems Division (UTC). He alleged claims for (1) wrongful discharge in violation of public policy; (2) violation of the California Family Rights Act (Gov. Code, § 12945.2); and (3) breach of an implied contract that he would be terminated only for cause.[1]

Although we hold that California law recognizes a tortious wrongful discharge claim based upon the public policy underlying the California Family Rights Act, we will nonetheless affirm the entry of summary adjudication in UTC's favor on the first two causes of action. We will also affirm the judgment and $29,800 awarded Nelson on his third cause of action for breach of an implied contract.

*Facts and Procedural Background*

Since 1988, Nelson was employed as a firefighter at UTC. On March 21, 1995, Nelson's wife, Stacy, who worked as a grocery bagger, was hit on the back of the head by the hatchback door of a vehicle into which she was loading groceries. Stacy suffered a severe concussion.

On Saturday, March 25, 1995, Stacy telephoned Nelson at work. She complained of severe headaches, dizziness, nausea and fainting spells. Nelson ultimately called 911, and an ambulance was dispatched to take Stacy to the hospital. Nelson received permission from his supervisor, Lieutenant Dan Villalon, to leave work to meet Stacy.

---

[1]All further unspecified statutory references are to the Government Code.

Stacy began experiencing epileptic seizures. On March 26, 1995, Nelson called Lieutenant Dan Lopez, the supervisor on the Sunday shift, and Lieutenant Villalon, his regular supervisor who was at home. He advised them that he would not be at work on Monday, March 27, 1995 nor Wednesday, March 29, 1995 (the next two days he was scheduled to work). Nelson explained that he needed to care for Stacy as well as look after their two-year-old son. Although Nelson tried to arrange for the visiting nurses association to help care for Stacy and their son, he was told they would not have anyone available until the next week.

UTC management advised Nelson that he could use his own accrued sick leave to compensate for the days he would be home caring for his wife and son. UTC's company policy allowed Nelson to take sick leave to attend to injured or ill family members.

Besides working as a firefighter for UTC, Nelson was also a volunteer firefighter for the California Department of Forestry (CDF). CDF paid Nelson $8 per call he answered to help defray his expenses. UTC approved of Nelson's volunteer work because it improved Nelson's work skills. Nelson carried a pager so that CDF could call him to report a fire or other emergency to which Nelson might respond.

Although CDF paged Nelson several times when Nelson was home caring for his wife, Nelson was unable to respond to these calls because he was busy caring for Stacy. However, one such call, reporting a barn fire located two to three miles from Nelson's house, came on March 29, 1995. At that time, Nelson's friend, C. Sanchez, was visiting Nelson's home. Sanchez offered to stay with Stacy and Nelson's son so Nelson could go help fight the fire. Stacy agreed and urged Nelson to go. Nelson drove his car to the fire, helped extinguish it, and then returned to his home within the hour.

On Monday April 3, 1995, Nelson traded his shift with another UTC firefighter and therefore did not work on that date either. On April 3, 1995, Nelson was paged again, by King City Dispatch, and was advised that there was an automobile accident approximately three miles from his home. Nelson responded to the scene, waited until the ambulance arrived, and helped load the injured motorcyclist into the ambulance. He then went home; he was gone from his home less than one hour.

On April 5, 1995, Nelson returned to work. He filled in his time card for March 29, but did not deduct the time he spent fighting the CDF fire. Evidently, someone had told UTC that Nelson was performing other work while he was supposed to be on sick leave caring for his wife. After being

asked to explain the charge, Nelson prepared a written statement truthfully explaining what had happened.[2] UTC reversed Nelson's time card entry, concluded that Nelson had engaged in "time card fraud" and immediately terminated Nelson's employment. Nelson's supervisor decided that Nelson's conduct showed that he was "working" while he was supposed to be caring for Stacy, and that therefore Nelson had "deceived or cheated the company."

In 1996, Nelson sued UTC, seeking damages arising out of the termination of his employment. His complaint stated claims for (1) wrongful termination in violation of the California Family Rights Act (§ 12945.2); (2) wrongful termination in violation of public policy as set forth in *Ely* v. *Wal-Mart, Inc.* (C.D.Cal. 1995) 875 F.Supp. 1422; and (3) wrongful termination in violation of express and implied contracts not to terminate except for cause.

UTC moved for summary judgment, or alternatively summary adjudication of the issues. In 1997, the trial court granted summary adjudication as to the first two causes of action. The trial court denied UTC's motion for summary adjudication as to the third cause of action.

Nelson's motion for reconsideration was denied. Nelson then sought writ review before our court. We summarily denied the writ on November 24, 1997.

The matter was scheduled to go to trial on the third cause of action. Subsequently, the parties stipulated that the matter would proceed by way of a general reference before a referee/arbitrator. The reference proceeded on March 23, and March 24, 1998 before Nat A. Agliano, Justice (retired).

On April 20, 1998, Justice Agliano issued the referee's statement of decision. He found that there was an implied contract that Nelson could only be terminated for cause. He also found that UTC did not have cause to discharge Nelson. According to Justice Agliano, Nelson "did not intend to deceive, and he did not deceive, his employer. [Nelson] was properly on sick leave when CDF paged him about the barn fire on March 29, 1995. [Nelson] was not compelled to respond to the CDF page and he would not have done so on this particular occasion if his friend were not there to watch after [Nelson's] wife. [Nelson's] obligation was to use his sick leave to care for his wife. [Nelson] was performing this obligation and he did not violate it by delegating to his friend for approximately 45 minutes while [Nelson] left to

---

[2] In his statement, Nelson mistook the CDF fire of March 29 for the April 3 auto accident call that took place when Nelson was off work. But as found by the trier of fact, the mistake was not material and the April 3 call occurred while Nelson was off work.

perform an emergent civic function. By almost any reasonable standard, [Nelson's] brief absence from home was not, under the described circumstances, inconsistent with his status on sick leave to care for his wife. Reasonable minds might differ whether [Nelson] should have debited himself an hour of time on his time card to reflect the time he was helping to extinguish the barn fire. The $8.00 stipend he received from CDF did not necessarily result in double compensation. Had he deducted the hour, it appears he would have saved an hour of sick leave which he could have taken later that year if circumstances warranted. The fact that he did not deduct the time amounted, at most, to an honest mistake. The evidence, however, clearly proves that plaintiff's conduct did not constitute time card fraud which was the employer's stated reason for terminating [Nelson]."

Justice Agliano then carefully considered Nelson's damages. He examined Nelson's jobs since the termination. Based upon the differences in wages and benefits, Justice Agliano awarded Nelson $29,800.

The trial court adopted Justice Agliano's decision, and awarded Nelson $29,800. The trial court further decided that Nelson was the prevailing party and that he was entitled to his costs.

UTC appeals the trial court's judgment in favor of Nelson. Nelson appeals the trial court's entry of summary adjudication on his first two causes of action.

### Standards of Review

Summary judgment is granted when there are no triable issues as to any material facts and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) ■ When reviewing a trial court's decision to grant summary judgment, we must identify the issues framed by the pleadings, and determine whether the moving party has established facts which negate the opposing party's facts and justify a judgment in the moving party's favor. When the moving party's facts prima facie justify a judgment, we determine whether the opposing party has demonstrated the existence of a triable issue of material fact. (*Turner* v. *Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1252-1253 [32 Cal.Rptr.2d 223, 876 P.2d 1022].)

■ "A judgment or order of the lower court is presumed correct. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the

constitutional doctrine of reversible error." (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 349, p. 394.)

In reviewing a challenge to the sufficiency of the evidence, we are bound by the substantial evidence rule. All factual matters must be viewed in favor of the prevailing party and in support of the judgment. All conflicts in the evidence must be resolved in favor of the judgment. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480].)

*Discussion*

I. *Summary Adjudication*

Nelson argues that the trial court erred in granting granted UTC's summary adjudication motion on Nelson's claims for tortious wrongful discharge and violation of the California Family Rights Act. Before addressing this claim, we first review the pertinent legal principles.

A. *California Family Rights Act*

In 1991, the California Legislature enacted the California Family Rights Act (CFRA). (§ 12945.2.) The CFRA, which is contained within the Fair Employment and Housing Act (FEHA), is intended to give employees an opportunity to take leave from work for certain personal or family medical reasons without jeopardizing job security.

One of the goals of the CFRA is to preserve the family unit in the face of a changing job market. In enacting the CFRA, the Legislature expressly found that more than 60 percent of women in the United States of childbearing age are in the labor force, and 40 percent of these women actually have a child under three years of age. (Stats. 1991, ch. 462, § 2, pp. 2263-2264.) Based upon these changing roles, and the need to promote stability and economic security in families, the Legislature found that both genders should have the option of taking leave for child-rearing purposes. (*Ibid.*) The Legislature also emphasized the growing number of elderly in our society, and the benefits of facilitating home care for such persons in terms of promoting economic savings to the health system, seniors, caregivers and employers. (Stats. 1991, ch. 462, § 3, p. 2264.)

One of the sponsors of the CFRA, Assembly member Moore, explained that the bill was "entitled the Family Rights Act of 1991. This designation denotes the fact that beneficiaries are not only employees, but the families of

Californians. The overarching theme of this legislation has been the need to permit workers to take leave to care for their families without fear of job loss, and, except for limitations based on number of employees or familial relationship, the bill should have the broadest possible implementation." (Assem. Daily J. (1991-1992 Reg. Sess.) p. 5548.)

Consistent with those purposes, and subject to certain limitations, the CFRA allows workers to take family and medical leave to care for their children, parents, spouses, or to recover from their own serious health condition. Specifically, the CFRA makes it unlawful "for any employer, as defined . . . to refuse to grant a request by any employee with more than 12 months of service with the employer, and who has at least 1,250 hours of service with the employer during the previous 12-month period, to take up to a total of 12 workweeks in any 12-month period for family care and medical leave . . . ." (§ 12945.2, subd. (a).)

The CFRA also provides that it is "an unlawful employment practice for an employer to refuse to hire, or to discharge, fine, suspend, expel, or discriminate against, any individual because of . . . [¶] (1) An individual's exercise of the right to family care and medical leave provided by subdivision (a)." (§ 12945.2, subd. (*l*).)

Under the CFRA, "family care and medical leave" includes "[l]eave to care for a parent or spouse who has a serious health condition." ( § 12945.2, subd. (c)(3)(B).) A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves either of the following: [¶] (A) Inpatient care in a hospital, hospice, or residential health care facility. [¶] (B) Continuing treatment or continuing supervision by a health care provider." (§ 12945.2, subd. (c)(8).) "Health care provider" includes licensed physicians. (§ 12945.2, subd. (c)(6).)

Based upon these provisions, it is clear that Nelson's circumstances qualified him for leave pursuant to the CFRA. UTC does not claim otherwise.

B. *Wrongful Discharge Violating CFRA Public Policy*

Having set forth the pertinent CFRA provisions, we next consider whether an employee may state a claim for tortious wrongful discharge based upon the CFRA. As we explain, we conclude that such a claim may be stated under California law.

### 1. *Parameters of the Tort*

■ In California, at-will employees may bring a tort action for wrongful discharge if their employer discharges them for a reason that violates fundamental public policy. (*Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 176 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314]; *Stevenson* v. *Superior Court* (1997) 16 Cal.4th 880, 886 [66 Cal.Rptr.2d 888, 941 P.2d 1157].) The availability of the tort helps prevent employers from using the threat of termination to coerce employees into committing crimes, concealing wrongful acts, or engaging in other conduct harmful to the public welfare. (*Tameny* v. *Atlantic Richfield Co., supra*, 27 Cal.3d 167, 176; *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373].) Indeed, the "vast majority of states have recognized that an at-will employee possesses a tort action when he or she is discharged for performing an act that public policy would encourage, or for refusing to do something that public policy would condemn." (*Gantt* v. *Sentry Insurance* (1992) 1 Cal.4th 1083, 1090 [4 Cal.Rptr.2d 874, 824 P.2d 680].)

Deciding what matters may validly be encompassed by a public policy claim has proved difficult. "The difficulty, of course, lies in determining where and how to draw the line between claims that genuinely involve matters of public policy, and those that concern merely ordinary disputes between employer and employee." (*Gantt* v. *Sentry Insurance, supra*, 1 Cal.4th at p. 1090.) Despite this difficulty, it has been noted that public policy wrongful discharge cases usually involve four categories: (1) refusal to violate a statute; (2) performing an obligation imposed by statute; (3) exercising a statutory privilege or right; and (4) reporting an alleged violation of a statute of public importance. (See, e.g., *Tameny* v. *Atlantic Richfield Co., supra*, 27 Cal.3d 167; *Petermann* v. *International Brotherhood of Teamsters* (1959) 174 Cal.App.2d 184 [344 P.2d 25]; *Wetherton* v. *Growers Farm Labor Assn.* (1969) 275 Cal.App.2d 168 [79 Cal.Rptr. 543]; *Hentzel* v. *Singer Co.* (1982) 138 Cal.App.3d 290 [188 Cal.Rptr. 159, 35 A.L.R.4th 1015]; *Gantt* v. *Sentry Insurance, supra*, 1 Cal.4th at p. 1092; see generally, Note, *Protecting Employees At Will Against Wrongful Discharge:* The *Public Policy Exception* (1983) 96 Harv. L.Rev. 1931, 1936-1937.)

Under *Gantt* v. *Sentry Insurance, supra*, 1 Cal.4th 1083, the California Supreme Court clarified the public policy requirement. *Gantt* decided that the policy must be (1) supported by either statutory or constitutional provisions; (2) public, in the sense that the policy "inures to the benefit of the public" rather than serving merely the individual's interests; (3) have been articulated at the time of the discharge; and (4) be substantial and fundamental. (*Id.* at p. 1095; see also *Green* v. *Ralee Engineering Co.* (1998) 19

Cal.4th 66, 74 [78 Cal.Rptr.2d 16, 960 P.2d 1046]; *Stevenson* v. *Superior Court, supra,* 16 Cal.4th 880, 889.)

More recently, the California Supreme Court again examined the tort in *Stevenson* v. *Superior Court, supra,* 16 Cal.4th 880. In *Stevenson,* the court determined that the policy prohibiting employment discrimination based upon age was sufficient to permit an employee to state a claim for tortious wrongful discharge against an employer subject to the FEHA. According to *Stevenson,* the policy (1) was articulated within a statute (the FEHA); (2) benefits society at large, (3) was established at the time of the employee's discharge; and (4) was substantial and fundamental. (*Stevenson* v. *Superior Court, supra,* 16 Cal.4th at p. 884.)

In finding that the FEHA's policy against age discrimination by employers having more than four employees was fundamental and substantial, the court was persuaded by the similarities between the policies prohibiting age discrimination and the policies prohibiting discrimination based upon sex and race. *Stevenson* also emphasized that the FEHA's general prohibition against age discrimination was "a particular expression of a broader policy against age discrimination that the Legislature has articulated through a wide variety of California code provisions." (16 Cal.4th at p. 896.) In addition, the laws of other jurisdictions bolstered the view that the policy against age discrimination is fundamental and substantial. (*Id.* at p. 897.)

*Stevenson* also found that because the FEHA does not preempt any common law tort claims, the FEHA's age discrimination remedies are not exclusive and "do not bar a tort claim for wrongful discharge in violation of the public policy against age discrimination." (16 Cal.4th at p. 885.)

2. *Application to CFRA*

■■■ As we explain below, the CFRA policy satisfies all of the requirements identified in *Gantt/Stevenson.* Accordingly, just as an employee may state a tortious wrongful discharge claim against an employer subject to the FEHA based upon the FEHA policy prohibiting age discrimination, an employee may also bring a tortious wrongful discharge claim against an employer subject to the CFRA based upon the policy prohibiting discrimination under the FEHA's CFRA.

First, the policy is set forth within a statutory provision—the CFRA. Not only does the FEHA, of which the CFRA is a part, declare a general policy against employment discrimination, but the CFRA itself contains numerous and detailed descriptions of an employer's obligations with regard to medical and family leave, and prohibits an employer from discriminating against

an employee for exercising the right to family and medical leave. (§ 12945.2.)

Second, it is clear that the policy benefits the public at large. By prohibiting employment discrimination based upon family and medical leave, the CFRA strengthens the FEHA's general goal of preventing the deleterious effects of employment discrimination, and also furthers the CFRA's specific goal of promoting stability and economic security in California families. As already noted, one of the act's sponsors, Assembly member Moore, expressly declared that the beneficiaries of the CFRA "are not only employees, but the families of Californians. The overarching theme of this legislation has been the need to permit workers to take leave to care for their families without fear of job loss, and except for limitations based on number of employees or familial relationship, the bill should have the broadest possible implementation." (Assem. Daily J., *supra*, p. 5548.) Based upon the foregoing, the policy behind the CFRA is a policy which "inures to the benefit of the public at large rather than to a particular employer or employee." (*Foley* v. *Interactive Data Corp.*, *supra*, 47 Cal.3d at p. 669.)

Third, the FEHA's policy against employment discrimination resulting from the exercise of rights under the CFRA was well established when UTC fired Nelson. The CFRA was enacted in 1991, and Nelson was discharged in 1995. As one court reasoned: "Nothing in *Rojo* or *Gantt* requires that the public policy which has allegedly been violated have been existence before the FEHA; the . . . requirement is that it be fundamental and well-established, i.e., that it has been contained in a constitutional or statutory provision long enough for an employer to have notice of it." (*Ely* v. *Wal-Mart, Inc.*, *supra*, 875 F.Supp. 1422, 1428.)[3]

Fourth, after careful consideration, we believe the policy behind the CFRA is fundamental and substantial. The fact that the act is included within the FEHA supports the argument that the act reflects a fundamental and substantial policy. Assembly member Moore's comments, emphasizing "the need to permit workers to take leave to care for their families without fear of job loss" and that "the bill should have the broadest possible implementation" also indicate that the policy supporting the CFRA is substantial and fundamental. Promoting the stability and economic security of families, which is one of the goals of the CFRA, likewise reflects a fundamental and substantial public policy.

In addition, the laws of other jurisdictions bolster the view that the policy within the CFRA is fundamental and substantial. Discrimination based upon

---

[3]In 1993, UTC itself circulated a notice to employees stating that they were entitled to use sick leave to care for dependents, including spouses.

an employee's taking family and medical leave has been determined to be a matter of sufficient gravity to warrant legislative action by the United States Congress through the federal Family and Medical Leave Act of 1993 (FMLA). (See, e.g., *Stevenson* v. *Superior Court, supra,* 16 Cal.4th 880, 897 [policy against age discrimination shown to be substantial and fundamental in that age discrimination in employment prohibited under federal law].) Under the FMLA, which parallels the CFRA, Congress declared that the purpose of the act was to "balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity; . . ." (29 U.S.C. § 2601(b)(1).) Further, laws against discrimination based upon medical and family leave have been adopted in numerous states and the District of Columbia. (See Annot., Validity Construction, and Application of State Family-, Parental-, or Medical-Leave Acts (1998) 57 A.L.R.5th 477; see also *Stevenson* v. *Superior Court, supra,* 16 Cal.4th 880, 897 [policy against age discrimination shown to be substantial and fundamental in that age discrimination in employment prohibited under laws of 45 states and the District of Columbia].)

In *Stevenson,* the California Supreme Court stressed that the FEHA's general prohibition against age discrimination in employment was a "particular expression of a broader policy against age discrimination that the Legislature has articulated through a wide variety of California code provisions." (*Stevenson* v. *Superior Court, supra,* 16 Cal.4th at p. 896.) With respect to family and medical leave, the Legislature's policy supporting similar forms of leave has been articulated through other California Code provisions. (See, e.g., Ed. Code, § 89519; Gov. Code, §§ 19991.1, 19991.4, 19991.6.) However, even if the CFRA policy prohibiting discrimination based upon the taking of family and medical leave was not as well entrenched within California law as the policy prohibiting age discrimination, that simply reflects the fact that the CFRA was adopted in response to the changing roles of men and women in the work force and family. The fact that a problem is of more recent origin is not, to us, a persuasive reason for questioning the substantiality or fundamental nature of the policy behind the law addressing the problem.

Finally, it is of no import that the CFRA itself provides remedies when the act is violated. As already noted, in *Stevenson,* the California Supreme Court specifically decided that because the FEHA does not preempt any common law tort claims, the FEHA's age discrimination remedies are not exclusive and "do not bar a tort claim for wrongful discharge in violation of the public policy against age discrimination." (*Stevenson* v. *Superior Court, supra,* 16 Cal.4th at p. 885.) Similarly, the CFRA's remedies should not be considered

exclusive and should not operate to bar a tort claim for wrongful discharge based upon violation of the CFRA. As the California Supreme Court emphasized in *Rojo* v. *Kliger* (1990) 52 Cal.3d 65, 75 [276 Cal.Rptr. 130, 801 P.2d 373] ". . . we believe the Legislature has manifested an intent to amplify, not abrogate, an employee's common law remedies for injuries relating to employment discrimination. Had the Legislature intended otherwise, it plainly knew how to do so." Nothing within the FEHA or CFRA indicates that the CFRA was meant to abrogate an employee's common law remedies for injuries relating to employment discrimination.

Two federal decisions have also concluded that the CFRA policy is sufficient to support a tortious wrongful discharge claim. (*Ely* v. *Wal-Mart, Inc., supra*, 875 F.Supp. 1422; *Mora* v. *Chem-Tronics, Inc.* (S.D.Cal. 1998) 16 F.Supp.2d 1192.) In *Ely*, which was decided before *Stevenson*, the federal district court held that a common law action existed under California law for wrongful discharge in violation of the public policy set forth within the CFRA. More recently, in *Mora* v. *Chem-Tronics, Inc., supra*, 16 F.Supp.2d 1192, a different federal district court reached the same conclusion. *Mora* decided that an employee could state a claim for tortious wrongful discharge under the CFRA, as well as under its federal counterpart, the FMLA. *Mora* agreed with the reasoning of *Ely*, and also cited *Stevenson* to support its holding. *Mora* also noted that *Ely* "dispensed with the two arguments defendants have previously raised . . . when faced with a claim for wrongful termination in violation of the public policy of FMLA. Those arguments are: 1) that there is no clear mandate of public policy embodied within the FMLA, and 2) even if FMLA constitutes public policy the court should not recognize a claim because the FMLA provides its own comprehensive remedies." (16 F.Supp.2d at p. 1231, citing *Gall* v. *Quaker City Castings, Inc.* (N.D.Ohio 1995) 874 F.Supp. 161.)

For these reasons, we conclude that an employee may state a claim under California law for wrongful termination in violation of the public policy within the CFRA.

C. *Summary Adjudication*

█ Having so decided, we next consider whether the trial court should have granted summary adjudication in favor of UTC on that claim. Nelson alleged that UTC fired him for exercising his rights under the CFRA and that therefore the discharge violated fundamental public policy. Although UTC denies discharging Nelson for exercising those rights, Nelson contends UTC's reasons for terminating him were merely a pretext for discrimination.

As we explain, under the circumstances here, summary adjudication was proper.[4]

If Nelson had reached trial on his CFRA claims, he would have borne the initial burden of proving that he was discriminated against in violation of the CFRA. ▉ Under well-settled rules of order of proof, the employee must first demonstrate a prima facie showing of prohibited discrimination. If the employee does so, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. The employee then has the burden of proving the proffered justification was a pretext for discrimination. (*McDonnell Douglas Corp.* v. *Green* (1973) 411 U.S. 792, 802 [93 S.Ct. 1817, 1824, 36 L.Ed.2d 668]; *Texas Dept. of Community Affairs* v. *Burdine* (1981) 450 U.S. 248, 252-253 [101 S.Ct. 1089, 1093-1094, 67 L.Ed.2d 207]; *Heard* v. *Lockheed Missiles & Space Co.* (1996) 44 Cal.App.4th 1735, 1748 [52 Cal.Rptr.2d 620]; *Martin* v. *Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1730-1731 [35 Cal.Rptr.2d 181].)[5]

▉ When a defendant moves for summary judgment/adjudication, these trial procedure rules have no direct application. As we explained in *Martin* v. *Lockheed Missiles & Space Co., supra,* 29 Cal.App.4th at pages 1730-1731, "A defendant seeking summary judgment must bear the initial burden of showing that 'the action has no merit' [citation], and the plaintiff will not be required to respond unless and until the defendant has borne that burden. [Citations.] In this sense, upon a defendant's summary judgment motion in an employment discrimination action 'the burden is reversed . . . .' [Citation.]"

Accordingly, we consider UTC's claim that it " ' clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." (*St. Mary's Honor Center* v. *Hicks* (1993) 509 U.S. 502, 507 [113 S.Ct. 2742, 2747, 125 L.Ed.2d 407], italics omitted.) UTC's evidence meets this requirement. UTC submitted evidence that Nelson was fired because he spent part of his paid

[4]Since we conclude that summary adjudication was proper on Nelson's public policy claim, it follows that summary adjudication was also warranted on his claim based upon violation of the CFRA. Under the circumstances here, the analysis for both claims is the same. (See, e.g., *Stevenson* v. *Superior Court, supra,* 16 Cal.4th at p. 904.)

[5]Federal courts considering FMLA retaliation and discrimination claims apply the framework utilized under *McDonnell Douglas Corp.* v. *Green, supra,* 411 U.S. 792, 802 [93 S.Ct. 1817, 1824]. (See, e.g., *Hodgens* v. *General Dynamics Corp.* (1st Cir. 1998) 144 F.3d 151, 165; *King* v. *Preferred Technical Group* (7th Cir. 1999) 166 F.3d 887, 891.) Although no California court has addressed this issue with respect to the CFRA, California does rely upon federal discrimination decisions to interpret the FEHA. (*Heard* v. *Lockheed Missiles & Space Co., supra,* 44 Cal.App.4th at p. 1745.)

sick leave time working as a volunteer firefighter. "By producing evidence . . . of nondiscriminatory reasons, [employers] sustained their burden of production . . . ." (*Id.* at p. 509 [113 S.Ct. at p. 2748], italics omitted.)

The question then becomes whether Nelson's evidence raises a triable issue of fact regarding pretext. A nonmoving plaintiff may show pretext either indirectly by demonstrating that the employer's stated reasons for its adverse action were not credible, or directly by establishing that the employment decision was more likely motivated by a discriminatory reason. (*Texas Dept. of Community Affairs* v. *Burdine, supra,* 450 U.S. 248, 252-253 [101 S.Ct. 1089, 1093-1094]; *Hodgens* v. *General Dynamics Corp., supra,* 144 F.3d 151, 166.)

 Nelson's showing does not raise a triable issue of fact regarding pretext. The undisputed evidence reveals that UTC not only allowed Nelson to take leave to care for his wife, but it allowed him to take paid sick leave, which it was not required to do under the CFRA.[6] (§ 12945.2, subd. (e).) To say that UTC provided Nelson with more benefits than the CFRA required while simultaneously intending to fire him for exercising his CFRA rights requires a leap we are not prepared to take. " '[I]f the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation,' summary judgment may be appropriate even where intent is an issue." (*Hodgens* v. *General Dynamics Corp., supra,* 144 F.3d 151, 167.)

Moreover, the undisputed evidence also shows that UTC fired Nelson because he worked as a volunteer firefighter for one hour while he was on paid sick leave. Nelson's emphasis upon the label "time card fraud," and his claim that the fact that he did not commit time card fraud means that UTC's reason for firing him was false, reveals confusion in his analysis. Justice Agliano decided that Nelson's conduct did not rise to the level of time card fraud; not that UTC was lying when UTC stated it fired Nelson for spending one hour of his sick leave time fighting a fire. No part of the evidence submitted suggests that UTC was being "phony" or mendacious when it said it discharged Nelson because he volunteered to fight the fire. (See, e.g., *St. Mary's Honor Center* v. *Hicks, supra,* 509 U.S. 502, 509 [113 S.Ct. 2742, 2748].)[7] Simply put, Nelson submitted no admissible evidence indicating that Nelson's conduct in fighting a fire while on paid sick leave was not the

---

[6]Under the CFRA, "an *employee shall not use sick leave* during a period of leave in connection with the birth, adoption, or foster care of a child, or *to care for a* child, parent, or *spouse with a serious health condition, unless mutually agreed to by the employer and employee.*" (§ 12945.2, subd. (e).)

[7]Nelson's own deposition testimony supports the view that UTC's reason for firing Nelson, while not constituting cause for termination, was nevertheless not concocted. According to Nelson, UTC officials told him that "while I could have gone to the store, to the beach, or to

real reason UTC terminated him, or that UTC was discriminating against Nelson because he exercised his rights under the CFRA. (*Id.* at p. 515 [113 S.Ct. at pp. 2751-2752].)

## II. *Referee's Decision*

UTC argues the referee erred in finding in Nelson's favor. In particular, UTC contends (1) there was no implied promise that Nelson would only be terminated for cause; (2) even if there was, UTC had good cause to terminate; and (3) even if there was no good cause to terminate, the referee improperly calculated Nelson's damages. These arguments are without merit.

Under Labor Code section 2922, there is a statutory presumption that employment for an indefinite period is terminable at will. (Lab. Code, § 2922; see also *Scott* v. *Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 463 [46 Cal.Rptr.2d 427, 904 P.2d 834].) The presumption may be overcome if there is an implied-in-fact contract requiring cause to terminate the employee. (11 Cal.4th at p. 463; *Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d 654, 677.) Such an implied-in-fact contract may be based upon the employer's course of conduct and oral representations. Whether or not the parties' conduct establishes an implied agreement to terminate only if there is cause is generally a question of fact. (*Scott* v. *Pacific Gas & Electric Co., supra,* 11 Cal.4th 454, 463; *Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d 654, 677.)

In this case, substantial evidence supports Justice Agliano's finding, which was adopted by the trial court, that there was an implied contract that UTC would only terminate Nelson for cause. It is true that Nelson signed an employment application which provided, among other things, that "I also understand that neither this application nor any other communication by any management representative either written or oral, made at the time of hire or during the course of employment, is intended in any way to create an employment contract." However, as Justice Agliano found, this provision did not unambiguously establish at-will employment. Moreover, we note that this part of the application is ambiguous and contradictory. This is because the application attempts to establish a binding employment condition while at the same time expressly providing that neither the application nor subsequent communications can create a binding employment condition or contract.

---

the park on the date in question, and legitimately used my sick leave, answering a call as a volunteer fireman on March 29, 1995, for even one hour, was wrong in that I was allegedly 'working' and therefore, I had somehow deceived or cheated the company."

In sworn testimony, UTC's human resources specialist admitted that it was UTC's policy to terminate employment only for good cause. Further, UTC had written rules specifying what would constitute good cause for dismissal. There was evidence that Nelson had been employed at UTC since 1988 and that he had received periodic written work reviews which rated his performance as good. Taken together, this evidence constitutes substantial evidence to support the conclusion that there was an implied contract that Nelson could only be terminated for cause.

There was also substantial evidence to support Justice Agliano's finding that UTC did not have cause to terminate Nelson. ■ Good cause for termination has been described as " ' "a fair and honest cause or reason, regulated by good faith on the part of the party exercising the power" ' [citation], as opposed to one that is 'trivial, capricious, unrelated to business needs or goals, or pretextual . . . .' " (*Scott* v. *Pacific Gas & Electric Co.*, *supra*, 11 Cal.4th 454, 467.) ■ In this case, the evidence demonstrates that UTC did not have good cause. As Justice Agliano reasoned: "[Nelson's] obligation was to use his sick leave to care for his wife. [Nelson] was performing this obligation and he did not violate it by delegating it to his friend for approximately 45 minutes while [Nelson] left to perform an emergent civic duty. By almost any reasonable standard, [Nelson's] brief absence from home was not, under the described circumstances, inconsistent with his status on sick leave to care for his wife. Reasonable minds might differ whether [Nelson] should have debited himself an hour of time on his time card to reflect the time he was helping to extinguish the barn fire. The $8.00 stipend he received from CDF did not necessarily result in double compensation. Had he deducted the hour, it appears he would have saved an hour of sick leave which he could have taken later that year if circumstances warranted. The fact that he did not deduct the time amounted, at most, to an honest mistake. The evidence, however, clearly proves that plaintiff's conduct did not constitute time card fraud which was the employer's stated reason for terminating [Nelson]."

■ Finally, UTC complains that the damage award was calculated incorrectly. After reviewing the record, we disagree. UTC complains that the damages included a $7,000 penalty Nelson paid due to early withdrawal of his UTC pension plan. As the referee found, however, Nelson had to withdraw this money to meet living expenses. This finding is supported by substantial evidence.

UTC also argues that the totality of Nelson's earnings from the time he was terminated until present shows that he is better off than he would have been had he stayed at UTC. In essence, UTC asks the court to lump together

all of Nelson's earnings from the time he was terminated until present and find that he suffered little or no loss.

We reject this argument. It assumes that Nelson would never have been promoted had he stayed at UTC. Basically, Justice Agliano looked at each time period of Nelson's claimed damages and awarded damages for each period in which Nelson suffered a loss. The damages awarded were not excessive, were supported by the evidence, and did not constitute an abuse of discretion.

## Disposition

The judgment is affirmed. Costs on appeal to Nelson.

Cottle, P. J., and Premo, J., concurred.

On September 22, 1999, the opinion was modified to read as printed above.