[No. B217764. Second Dist., Div. Two. Aug. 16, 2011.]

KATRINA L. ROGERS, Plaintiff and Respondent, v.
COUNTY OF LOS ANGELES, Defendant and Appellant.

## COUNSEL

Miller Barondess, Louis R. Miller and Mira Hashmall for Defendant and Appellant.

Law Offices of Franklin L. Ferguson, Jr., and Franklin L. Ferguson, Jr., for Plaintiff and Respondent.

## OPINION

**DOI TODD, J.**—After 19 weeks of medical leave, longtime employee Katrina L. Rogers returned to her job with the County of Los Angeles (County), only to learn that she was being transferred to another position in another department. She sued the County for violation of California's Moore-Brown-Roberti Family Rights Act (CFRA) (Gov. Code, § 12945.2). Her

claim had two components: (1) that the County *interfered* with her CFRA rights by transferring her to a noncomparable position, and (2) that the County *retaliated* against her for exercising her right to take CFRA leave. The jury returned a special verdict in her favor and awarded damages of $356,000.

The County appealed, contending that her interference claim was barred as a matter of law and that there was insufficient evidence to support her retaliation claim. We agree and reverse the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

*Rogers's Employment*

Rogers worked more than 36 years for the County in various positions. Most recently, she was the personnel officer (or chief of special services) in the executive office, which was responsible for rendering administrative and other support services to the Los Angeles County Board of Supervisors (Board of Supervisors) and its various commissions. Rogers supervised employees who performed personnel, payroll, and human resources functions for the board and the executive office. She considered it an honor and privilege to work with the County's governing body.

In early 2006, Rogers discussed retirement with her coworkers and her desire to spend more time with her grandson. She testified that she looked at the figures impacting her retirement "all the time." She met with the County's retirement plan administrators to determine how to maximize her retirement benefits, but had not actually planned for a retirement.

*Rogers's Medical Leave*

On April 3, 2006, Rogers took a medical leave due to work-related stress. Her medical provider, Dr. Paul L. Guidry, sent her paperwork to VPA, Inc., the County's third party administrator responsible for handling personnel leave matters. On April 12, 2006, Rogers was sent a form "FMLA pre-designation letter" from one of her subordinates, Ernesto Gomez, assistant chief of personnel and special services. The cover letter stated that Rogers's leave was "pending approval from VPA of [her] Short Term Disability claim." The enclosed letter indicated that Rogers was being placed on leave due to a "serious health condition" that made her unable to perform the essential functions of her job. The letter explained that Rogers's "family/medical/CFRA leave started April 3, 2006," and would continue until the conditions of her leave changed or until her leave time was "exhausted." The letter also stated

that she had "a right for up to 12 weeks of unpaid family/medical leave in a 12-month period." Checkmarks on the form letter indicated that she was eligible for leave, and that she would not be required to furnish medical certification or recertification, or periodic updates of her status or intent to return to work. VPA approved Rogers's leave pursuant to the County's short-term disability benefits program, and she received these benefits, including payments, and other County benefits while on leave.

Rogers testified that during her leave she saw Dr. Guidry about every three weeks, and that he told her that she could not perform her job duties because she could not think clearly and had headaches. Rogers testified that her stress resulted from "an attack on my integrity," and manifested in her crying at work, not being able to sleep or eat, and causing her blood pressure to become "out of whack." Dr. Guidry did not release Rogers to return to work until August 2006.

*Changes in the Executive Office*

Effective April 17, 2006 (after Rogers began her leave), Sachi A. Hamai was appointed executive officer. She testified that when she interviewed for the position, she presented her "vision of the organization to the Board of Supervisors," and that "[c]oming into the organization, there were a number of changes that were going to be made" to streamline the organization and make it run more efficiently. After her appointment, she interviewed numerous individuals, including most of the managers in the executive office, the commissioners, and the chief deputies of the five county supervisors "to elicit what the needs of our services were," and from there she "began to look at the organization to see how [it could] best meet the needs for our customers [(the Board of Supervisors)]."

One of Hamai's concerns was that everyone was reporting directly to her for approval of "every little task," like signing off on mileage claims, and that she was having to act as the liaison between the board and the commissions, which was "quite overwhelming." She therefore exercised her discretion as executive officer to add the position of administrative deputy, so that she would no longer have to micromanage everything. She was surprised that the department did not already have such a position, as most of the County's departments had administrative deputies to handle administrative functions. By adding this position, Hamai extended the department's vertical hierarchy by moving some divisions below the administrative deputy position, including Rogers's position as personnel officer, and some above, including the commissioners so that they could have a more direct relationship with her. Hamai developed a strategic plan for the organization and put systems in place to measure whether the office was meeting the needs and services of the Board of Supervisors.

In May 2006, as part of her continuing effort to streamline the organizational structure, Hamai decided to make other changes in the personnel office. She decided to bring in a new personnel officer in place of Rogers because she "felt that somebody outside the organization would come in and would be independent, objective, maybe perhaps could provide some fresh eyes into the organization." Hamai's decision was not based on any assessment that Rogers lacked capability, and no one had expressed any concerns about Rogers's work performance. Hamai testified that her decision had nothing to do with Rogers personally, and that she had worked well with Rogers in the past. Rogers also described her prior working relationship with Hamai as cordial. Hamai viewed her decision to transfer Rogers to another position as "a business decision." She testified that the fact Rogers was on leave when she made her decision had "absolutely" nothing to do with her decision. When asked if she was "bothered" by Rogers's absence, Hamai responded "no," because Rogers's assistant, Ernesto Gomez, was filling in for her and was assisting Hamai. Other employees were also transferred out of the department.

*Transfer of Rogers*

In May 2006, around the time she made the decision to transfer Rogers, Hamai met with Michael Henry, the County's then director of personnel and head of human resources, to enlist his assistance in identifying a comparable position for Rogers. Henry contacted Dave Lambertson, director of the internal services department (ISD), to ask if there was a high-level human resources position available. ISD has three business units: it is the County's largest information technology provider; it provides operation services for various facilities; and its contracting group manages County contracts and oversees the request for proposal process. ISD is significantly larger than the executive office, and its human resource professionals interact with all levels of ISD management. Lambertson, in turn, contacted Mark Colton, the personnel officer at ISD, who responded that he had high-level human resources work that required additional help. At Lambertson's request, Colton put together a job description. At that time, there was no budgeted vacancy in ISD. When drafting the new job description, Colton was unaware of who would be filling the position. He did not personally know Rogers, and had no understanding of her job duties in the executive office.

*Return from Leave*

On August 14, 2006, Rogers returned to the executive office, 19 weeks after her leave began on April 3, 2006. On her first day back she had a meeting with the new administrative deputy for the executive office, and others. At the meeting she received written notification from Hamai of her

transfer to ISD, which was to be effective August 21, 2006. The letter erroneously stated that the transfer was being made "at the request of ISD." Hamai testified it was her understanding from Michael Henry that ISD had an opening for a human resources manager. Rogers became "visibly upset" and "hostile," as she learned for the first time of the proposed transfer.

After the meeting, at Rogers's request, the administrative deputy provided her with a list of duties of which he was aware for the ISD position. Rogers also called Colton in ISD, who told her that he was pleased to have her join the department and that he looked forward to working with her. At Rogers's request, Colton sent her a copy of the job description for her proposed position.

Rogers testified that she considered the proposed transfer a "demotion" and "slap in the face." She was "devastated," "embarrassed," "humiliated," "hurt and disappointed." She repeatedly testified that she did not consider the new position comparable to her old position. In particular, the duties were different, in that she would no longer be supervising or managing anyone, but instead doing high-level staff work. Colton testified that after he compared the job duty descriptions for Rogers's position in the executive office and her new position in ISD, he believed the positions were "very different" and not comparable. Rogers admitted that she knew her pay would not be reduced and that she would not lose any salary or benefits by taking the ISD position.

On August 14, 2006, the same day she returned, Rogers left the office early and called in sick the rest of the week. Rogers then sent notice of her retirement from the County effective August 21, 2006, the day the transfer to ISD was to take place.

*Procedural History*

Rogers sued the County in December 2007 asserting various causes of action, including violation of her CFRA rights. After a successful motion for summary adjudication by the County, only her CFRA claim remained,[1] and the case proceeded to trial on this claim. The County's motion for a directed verdict was denied. The jury returned a special verdict in favor of Rogers, finding that the County had interfered with her CFRA rights by transferring her to a noncomparable position and had retaliated against her for exercising her CFRA rights. The jury awarded her damages of $356,000 as follows: $100,000 for past lost earnings; $206,000 for future lost earnings; $50,000 for past emotional distress; and $0 for future emotional distress. The County's motion for judgment notwithstanding the verdict was denied, and the County filed this appeal.

---

[1] Michael Henry and Sachi Hamai were dismissed as defendants.

## DISCUSSION

### I. *CFRA*

■ The CFRA entitles eligible employees to take up to 12 unpaid workweeks in a 12-month period for family care and medical leave to care for their children, parents, or spouses, or to recover from their own serious health condition.[2] (Gov. Code, § 12945.2, subd. (a); *Gibbs v. American Airlines, Inc.* (1999) 74 Cal.App.4th 1, 6 [87 Cal.Rptr.2d 554]; *Nelson v. United Technologies* (1999) 74 Cal.App.4th 597, 607 [88 Cal.Rptr.2d 239].) An employee who takes CFRA leave is guaranteed that taking such leave will not result in a loss of job security or other adverse employment actions. (Gov. Code, § 12945.2, subd. (*l*); Cal. Code Regs., tit. 2, § 7297.7, subd. (a).) Upon an employee's timely return from CFRA leave, an employer must generally restore the employee to the same or a comparable position. (Gov. Code, § 12945.2, subd. (a); Cal. Code Regs., tit. 2, § 7297.0, subds. (f), (g).) An employer is not required to reinstate an employee who cannot perform her job duties after the expiration of a protected medical leave. (*Neisendorf v. Levi Strauss & Co.* (2006) 143 Cal.App.4th 509, 519 [49 Cal.Rptr.3d 216] (*Neisendorf*).)

The CFRA is contained within the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.), which is intended to give employees an opportunity to leave work for certain medical reasons without jeopardizing job security. (*Neisendorf, supra,* 143 Cal.App.4th at p. 516.) The CFRA closely parallels its federal counterpart, the Family and Medical Leave Act of 1993 (FMLA) (29 U.S.C. § 2601 et seq.), which also provides that an eligible employee "shall be entitled to a total of 12 workweeks of leave during any 12-month period" due, among other things, to "a serious health condition that makes the employee unable to perform the functions of the position of such employee." (29 U.S.C. § 2612(a)(1)(D).) ■ Because the CFRA and the FMLA contain nearly identical provisions regarding family or medical leave (Gov. Code, § 12945.2, subd. (a); 29 U.S.C. § 2612(a)), California courts routinely rely on federal cases interpreting the FMLA when reviewing the CFRA. (*Neisendorf, supra,* at p. 514, fn. 1.)

■ Violations of the CFRA generally fall into two types of claims: (1) "interference" claims in which an employee alleges that an employer denied

---

[2] A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves either of the following: [¶] (A) Inpatient care in a hospital, hospice, or residential health care facility. [¶] (B) Continuing treatment or continuing supervision by a health care provider." (Gov. Code, § 12945.2, subd. (c)(8).) "Health care provider" includes licensed physicians. (Gov. Code, § 12945.2, subd. (c)(6).)

or interfered with her substantive rights to protected medical leave,[3] and (2) "retaliation" claims in which an employee alleges that she suffered an adverse employment action for exercising her right to CFRA leave. (*Hunt v. Rapides Healthcare System, LLC* (5th Cir. 2001) 277 F.3d 757, 763; *Dudley v. Department of Transportation* (2001) 90 Cal.App.4th 255, 260–261 [108 Cal.Rptr.2d 739].)

## II.  *Interference Claim*

Rogers claimed at trial that the County interfered with her CFRA rights by transferring her to a position the jury ultimately found was not comparable to the position she held when she began her leave. The County contends that Rogers's interference claim should never have reached the jury because, as a matter of law, she was not entitled to reinstatement when she failed to return to work at the end of her 12-week protected CFRA leave. We agree with the County.

■ Our conclusion that the CFRA's reinstatement right only applies when an employee returns to work on or before the expiration of the 12-week protected leave is based on several factors. First, the CFRA's statutory language expressly allows an employee "to take up to *a total of 12 work-weeks* in any 12-month period . . . ." (Gov. Code, § 12945.2, subd. (a), italics added.) The statute also requires an employer to provide "a guarantee of employment in the same or a comparable position *upon the termination of the leave.*" (Gov. Code, § 12945.2, subd. (a), italics added.) The statute provides that "[t]he 12-month period during which *12 workweeks of leave may be taken under this section* shall run concurrently with the 12-month period under the FMLA . . . ." (Gov. Code, § 12945.2, subd. (p), italics added.) The statute also expressly states that "[t]he aggregate amount of leave taken under this section or the FMLA, or both, . . . *shall not exceed 12 workweeks* in a 12-month period." (Gov. Code, § 12945.2, subd. (s), italics added.)

Second, other obligations under the CFRA are tied expressly to the 12-week protected leave policy. For example, the employer may require the employee to use accrued sick leave *"during the period of the leave."* (Gov. Code, § 12945.2, subd. (e), italics added.) The employer is only required to maintain and pay for coverage in a group health plan "for the duration of the leave, *not to exceed 12 workweeks* in a 12-month period . . . ." (Gov. Code, § 12945.2, subd. (f)(1), italics added.) Under certain circumstances, the employer can recover premiums paid for maintaining coverage for the employee under the group health plan if the employee "fails to return from

---

[3] The FMLA regulations interpret "interference" to include refusing the authorization of medical leave, discouraging the use of medical leave, and using the leave as a negative factor in employment actions. (29 C.F.R. § 825.220(a), (b) (2010).)

leave *after the period of leave to which the employee is entitled has expired.*" (Gov. Code, § 12945.2, subd. (f)(1)(A), italics added.) The employer may require the employee to pay for certain benefits *"during the leave period.*" (Gov. Code, § 12945.2, subd. (f)(2), italics added.) The CFRA also ties the employee's right to protected seniority to the employee's *"return[] from leave . . . .*" (Gov. Code, § 12945.2, subd. (g), italics added.)

Third, other courts interpreting the CFRA and the FMLA have concluded that the statutes only ensure protected leave for a 12-week period. (*Neisendorf, supra*, 143 Cal.App.4th at p. 518 [employee's right to reinstatement expires at end of 12-week protected period].) In reaching its conclusion, the *Neisendorf* court cited three federal cases holding that an employer does not violate the FMLA when it fires an employee who is unable to return to work at the conclusion of the 12-week protected period.[4] (See also *Hatchett v. Philander Smith College* (8th Cir. 2001) 251 F.3d 670, 677 ["However, an employee is not entitled to restoration if, at the end of the FMLA leave period, the employee is still unable to perform an essential function of the job."]; *Reynolds v. Phillips & Temro Industries, Inc.* (8th Cir. 1999) 195 F.3d 411, 414 [concluding no basis for FMLA claim where record established employee "could not have performed the essential functions of his job at the end of twelve weeks of leave"]; *Spangler v. Federal Home Loan Bank of Des Moines* (8th Cir. 2002) 278 F.3d 847, 851 [upon expiration of 12-week leave employer has no obligation to reinstate employee who does not return to work].)[5]

Finally, policy considerations underlying the FMLA, which closely parallels our CFRA, support our conclusion. In enacting the FMLA, Congress was concerned about "inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods."

---

[4] "(. . . *Cehrs v. Northeast Ohio Alzheimer's Research Center* (6th Cir. 1998) 155 F.3d 775, 784–785 [finding no FMLA violation because the evidence was undisputed that the employee would not have been able to return to work by the statutory deadline]; *Williams v. Toyota Motor Mfg., Kentucky, Inc.* (6th Cir. 2000) 224 F.3d 840, 845, revd. on other grounds, *Toyota Motor Mfg., Ky., Inc.* 534 U.S. 184 [151 L.Ed.2d 615, 122 S.Ct. 681] (2002) [concluding that the employee had suffered no harm when she was terminated because she was unable to resume her duties by the end of the FMLA leave period]; *Nunes v. Wal-Mart Stores, Inc.* (N.D.Cal. 1997) 980 F.Supp. 1336, 1340–1341, revd. on other grounds, *Kentmaster, supra*, 164 F.3d 1243 (9th Cir. 1999) [employer properly asserts its right to terminate employee when she failed to return to work at the close of the 12-week period].)" (*Neisendorf, supra*, 143 Cal.App.4th at p. 518.)

[5] The *Spangler* court compared the FMLA with the Americans with Disabilities Act of 1990 (ADA) (42 U.S.C. § 12112(a)), and noted that while "the ADA's protection is almost perpetual, lasting as long as the employee continues to meet the statutory criteria, the FMLA grants eligible employees 12 weeks of leave to deal with a specified family situation or medical condition. 29 U.S.C. § 2612." (*Spangler v. Federal Home Loan Bank of Des Moines, supra*, 278 F.3d at p. 851.)

(29 U.S.C. § 2601(a)(4).) The purposes of the FMLA are "(1) to balance the demands of the workplace with the needs of families, . . . [¶] (2) to entitle employees to take reasonable leave for medical reasons . . . [and] [¶] (3) to accomplish [these] purposes . . . in a manner that accommodates the legitimate interests of employers." (29 U.S.C. § 2601(b).) "The FMLA was predicated on two fundamental concerns—the needs of the American work-force, and the development of high-performance organizations." (29 C.F.R. § 825.101(b) (2010).) "The FMLA is both intended and expected to benefit employers as well as their employees." (29 C.F.R. § 825.101(c) (2010).) As one court noted in the context of the FMLA, "Congress only intended to mandate a minimum of twelve weeks of leave for employees, it did not intend to construct a trap for unwary employers who already provide for twelve or more weeks of leave for their employees." (*Ragsdale v. Wolverine Worldwide, Inc.* (8th Cir. 2000) 218 F.3d 933, 940.)

Here, the following is undisputed—the County accorded Rogers the full 12 workweeks of leave to which she was entitled under the CFRA; Rogers did not return to work at the end of this period, but instead remained on leave for 19 weeks; and the decision to transfer her was made within the 12-week leave period, but never communicated to Rogers during her leave. Rogers nevertheless argues that she suffered interference with her CFRA rights because the transfer decision was made during her protected CFRA leave. But she cites no authority to support her position, which we therefore disregard. (*Perez v. Grajales* (2008) 169 Cal.App.4th 580, 591–592 [86 Cal.Rptr.3d 784].) Based on the foregoing, we conclude that Rogers's right to reinstatement expired when the 12-week protected CFRA leave expired. Her CFRA interference claim therefore fails as a matter of law, and should never have been submitted to the jury.[6]

## III. *Retaliation Claim*

The County contends that Rogers's retaliation claim also fails because there was insufficient evidence that she suffered an adverse employment action as a result of exercising her right to take CFRA leave. We agree.

The CFRA provides that "[i]t shall be an unlawful employment practice for an employer to . . . discharge . . . or discriminate against, any individual because of . . . . [¶] (1) An individual's exercise of the right to

---

[6] We do not consider Rogers's equitable estoppel argument which was raised for the first time on appeal. (*Perez v. Grajales, supra,* 169 Cal.App.4th at pp. 591–592.) The fundamental rule that a reviewing court does not consider arguments or theories that could have been but were not raised below "is especially applicable to the doctrine of estoppel, which includes factual elements that must be established in the trial court. [Citation.]" (*Honig v. San Francisco Planning Dept.* (2005) 127 Cal.App.4th 520, 530 [25 Cal.Rptr.3d 649].)

family care and medical leave provided by" the CFRA. (Gov. Code, § 12945.2, subd. (*l*); see also Cal. Code Regs., tit. 2, § 7297.7.) A plaintiff can establish a prima facie case of retaliation in violation of the CFRA by showing the following: (1) the defendant was a covered employer; (2) the plaintiff was eligible for CFRA leave; (3) the plaintiff exercised his or her right to take a qualifying leave; and (4) the plaintiff suffered an adverse employment action *because he or she exercised the right to take CFRA leave.* (*Dudley v. Department of Transportation, supra,* 90 Cal.App.4th at p. 261.)

The jury found that the County's proposed transfer of Rogers to a position in ISD was not comparable to her position in the executive office. Assuming, without deciding, that substantial evidence supports this finding, and therefore the inference that Rogers suffered an adverse employment action, the question becomes whether substantial evidence supports the jury's finding in its special verdict that "the taking of medical leave was a motivating reason for the County's decision to transfer her."

"In evaluating the legal sufficiency of the evidence, the following basic approach is required: 'First, one must resolve all explicit conflicts in the evidence in favor of the respondent and presume in favor of the judgment all *reasonable* inferences. [Citation.] Second, one must determine whether the evidence thus marshaled is substantial. While it is commonly stated that our "power" begins and ends with a determination that there is substantial evidence [citation], this does not mean we must blindly seize any evidence in support of the respondent in order to affirm the judgment. The Court of Appeal "was not created . . . merely to echo the determinations of the trial court. A decision supported by a mere scintilla of evidence need not be affirmed on review." [Citation.] "[I]f the word 'substantial' [is to mean] anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with 'any' evidence. It must be reasonable . . . , credible, and of solid value . . . ." [Citation.] . . .' " (*Valenzuela v. State Personnel Bd.* (2007) 153 Cal.App.4th 1179, 1184–1185 [63 Cal.Rptr.3d 529], citing *Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632–1633 [29 Cal.Rptr.2d 191].)

The evidence adduced at trial consisted of the following: When Sachi Hamai was appointed as the new executive director effective April 17, 2006, she was already planning to make changes to the executive office. She wanted the office to work more efficiently to better serve the needs of the Board of Supervisors. She even described her vision of the new organizational structure during her interview for the position. Some of the changes Hamai made affected the personnel office. For example, she added the position of administrative deputy so that she no longer had to micromanage every little task. In May 2006, she also decided to bring in a new personnel officer because she

"felt that somebody outside the organization would come in and would be independent, objective, maybe perhaps could provide some fresh eyes into the organization." Hamai testified that her decision to transfer Rogers was not based on any assessment that Rogers lacked capability and had nothing to do with Rogers personally. Hamai also testified that she and Rogers had worked well in the past, and that no one had complained to her about Rogers's work. Hamai viewed her decision to transfer Rogers to another position as "a business decision." She testified that Rogers's having taken leave had "absolutely" nothing to do with her decision. Hamai was not bothered by Rogers's absence because Rogers's assistant, Ernesto Gomez, was filling in for her and was assisting Hamai. Hamai also transferred other employees out of the department.

Rogers put forth no evidence in response to the County's legitimate, nondiscriminatory reason for the decision to transfer her to another position. Indeed, in denying the County's motion for judgment notwithstanding the verdict, the trial court found that "[t]he County offered *undisputed evidence* Ms. Hamai's decision to request a reassignment for Rogers was motivated only to further her plan to reorganize the Executive Office." (Italics added.) Nevertheless, the court let the verdict stand, stating that "[t]he jury may well have doubted the testimony offered by County employees that their decisions were based solely on legitimate organizational reasons and not because Rogers was on an extended medical leave." But there was no evidence that at the time Hamai made the transfer decision that she, or Rogers, knew that Rogers would be on an "extended leave." Rogers had only been on leave about a month when the transfer decision was made.

In short, Rogers "failed to establish the requisite causal connection between her protected actions in taking a CFRA medical leave" and the decision to transfer her to another position. (*Neisendorf, supra,* 143 Cal.App.4th at p. 519.) "The unchallenged finding that [the County] had a legitimate, nondiscriminatory reason to [transfer Rogers], which had nothing to do with her CFRA leave, bars [Rogers] from articulating a cognizable cause of action for the jury's consideration based on [the County's] alleged refusal to honor the CFRA's right to reinstatement." (*Id.* at p. 520.) The *Neisendorf* court cited to several federal courts interpreting the FMLA that endorse this principle. (See, e.g., *Throneberry v. McGehee Desha County Hospital* (8th Cir. 2005) 403 F.3d 972, 979 ["As long as an employer can show a lawful reason, i.e., a reason unrelated to an employee's exercise of FMLA rights, for not restoring an employee on FMLA leave to her position, the employer will be justified to interfere with an employee's FMLA leave rights"].) Like the *Neisendorf* court, we conclude that because the County's "legitimate, nondiscriminatory reason" for the decision to transfer Rogers

eliminated any obligation the County might have had to reinstate her, Rogers "could not state a valid claim under the CFRA." (*Neisendorf, supra,* at p. 520.)

## DISPOSITION

In light of our conclusion that Rogers did not have valid CFRA claims, the jury's verdict and award of damages, as well as the award of costs and fees to Rogers, are reversed. The trial court is directed to enter judgment in favor of the County. Each party to bear their own costs on appeal.

Boren, P. J., and Chavez, J., concurred.

Respondent's petition for review by the Supreme Court was denied November 22, 2011, S196682.