Filed 6/4/14  Moore v. Century Gaming Management CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION TWO

| | |
|---|---|
| BRENDA MOORE, | B249978 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. BC474362) |
| CENTURY GAMING MANAGEMENT, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Michael L. Stern, Judge.  Reversed and remanded.

Horton Law Firm, Laura L. Horton and Flor C. Dery; Bruce Traney; Ben-Cohen Lawyers and Pejman Ben-Cohen for Plaintiff and Appellant.

Ford & Harrison, Stephen R. Lueke, Michelle B. Abidoye, and Stefan H. Black for Defendant and Respondent.

Brenda Moore (appellant) appeals from a judgment entered after the trial court granted summary judgment in favor of Century Gaming Management, Inc. doing business as Hollywood Park Casino (respondent) on appellant's claims against respondent for discriminatory termination; interference with rights under the California Family Rights Act (CFRA) (Gov. Code, §§ 12945.1, 12945.2); retaliatory termination for exercising her rights under the CFRA; tortious termination and discrimination in violation of public policy; and age discrimination. We find that triable issues of material fact exist as to each cause of action; therefore we reverse and remand for further proceedings.[1]

## FACTUAL BACKGROUND

When analyzing facts in the context of a summary judgment motion, "[w]e accept as true the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn from them. [Citation.]" (*Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 805.)

**Appellant's employment**

Respondent hired appellant as a general housekeeper in 1998. Appellant routinely received raises and was promoted to the position of lead housekeeper in 2001. In 2004, appellant was promoted to shift supervisor. Appellant reported to Ronnie Blackwell (Blackwell), director of housekeeping and Patricia Boston (Boston), housekeeping senior supervisor. Appellant was an at-will employee.

Over the years, as appellant aged, she noticed that Blackwell was "constantly on [her] all the time." In November 2006, appellant complained to Blackwell's superiors that he had suspended her without cause. When she returned, she filed a grievance. After that, she felt that Blackwell was watching her all the time, and he made comments to her such as "[Y]ou're slow. You walk like you're old." Blackwell told her that her

---

[1]     The trial court granted summary adjudication as to each of the subject causes of action, which were the only remaining causes of action at the time the motion was filed. The court then granted summary judgment, finding that no triable issues of fact remained. For simplicity, we will use the term "summary judgment" throughout this opinion.

2

department reflected her behavior. He used the term "laxadasy." (*Sic*.) Appellant could not understand his complaints since all the work was getting done. When appellant requested to work the first shift, Blackwell informed her that she would never work the first shift because she was slow. He stated that the people on appellant's shift were not "the sharpest knives in the cabinet."

Sometime after December 2006, appellant complained to human resources director Stephanie Dinwiddie (Dinwiddie) about Blackwell's behavior. Dinwiddie informed appellant that Blackwell would get upset if she interfered in his department.

**Respondent's family medical leave policy**

Respondent's employee handbook describes eligible employees' annual right to take 12 weeks of family medical leave, and describes the circumstances under which leave may be taken. Appellant acknowledged that she received the handbook on several occasions.

Respondent's family and medical leave policy requires employees to exhaust any unused vacation time during their family medical leave.[2] Employees also have the option to take paid unprotected leave, such as vacation, sick leave, and floating holidays, in lieu of protected family medical leave. If an employee elects to take unprotected leave in lieu of family medical leave, the time off is paid and does not count against the employee's family medical leave entitlement. Respondent had a standard leave of absence request form for employees wishing to take family medical leave.

Employees who wished to take unprotected leave in lieu of family medical leave were required to submit a request for vacation, sick leave, or floating holiday to their supervisor. If an employee had sufficient vacation time to fulfill the requested leave, the employee would not need to fill out a leave of absence request. In that case, the employee could simply go to his or her supervisor and seek the requested vacation time. A housekeeping employee who needed CFRA leave, but had sufficient vacation time, had

---

[2] Such a policy is permitted under both state and federal law. (See Gov. Code, § 12945.2, subd. (e); 29 U.S.C. § 2612(d)(2)(A).)

3

to submit a vacation request to Blackwell or Boston. Blackwell and Boston were authorized to approve requests for unprotected leave.

Employees that wished to take unprotected leave concurrent with family medical leave were required a submit a leave of absence request form with their request for unprotected leave. The employee would initially make the request to his or her supervisor, and present the paperwork showing why the family leave was necessary. The supervisor would then fill out the required paperwork to submit the family leave request to human resources. To ensure consistency, respondent required that all requests for family medical leave be submitted to benefits manager Sharon Wady (Wady), who had exclusive authority to approve family medical leave requests. However, it was the responsibility of supervisors such as Blackwell and Boston to inform human resources that the time off was for protected medical leave and to submit the necessary paperwork.

**Appellant's requests for leave**

In 2008, appellant's father was diagnosed with Alzheimer's disease and terminal cancer. Appellant attempted to get unprotected leave from Blackwell and Boston in order to care for her father, but they denied her requests. Appellant remembers clearly having at least two conversations with Wady in which she informed Wady of the situation and that she was finding it difficult to take time off to care for her father. Appellant would request leave from her supervisors which would be denied. When appellant would talk to Boston about CFRA, Boston acted as if she had no knowledge of its requirements. The last time appellant went to Wady with this problem, she told Wady she had given Boston and Blackwell a copy of the FMLA and was still being told she could not take time off work.

Tired of Boston and Blackwell's reactions to her requests for leave, appellant went directly to Wady in September of 2009, saying that Blackwell was "giving her a hard time" about absences related to her father's condition. Wady informed appellant that she could "avoid the whole situation by getting a medical certification for her dad." Wady provided appellant with a form to get a certification from her father's health care provider. Appellant filled out the first page of the form immediately and then took the

4

form to her father's doctor for completion. The doctor's signature on the form is dated October 20, 2009. Appellant brought the completed form back to human resources. Appellant explained: "What I wanted was to be able to take time off when my dad was sick to take care of him without being written up or harassed when I returned."

Wady recalled reviewing the document in 2009. She understood that appellant would need intermittent leave to care for her father. Although appellant's father's doctor suggested that appellant work on a part-time or reduced schedule, Boston informed appellant that part-time work was not available. Appellant understood that she could not take unpaid leave until she exhausted her vacation time. She never requested a full three months of unpaid leave because "it was such a fight to take time off." When she took time off, she would be written up for something. Appellant described her supervisors' criticisms: "The lady said the restroom wasn't clean when she walked in. There was a piece of paper on the floor. I'm writing you up. You know. You're taking too much time off. We don't have the staff for it." Appellant stated she felt it would be useless to ask for three months off when there was a problem with her taking off even a day or two.

After appellant submitted her formal certification for leave, she was occasionally granted leave. However, she could recall at least 10 times when Blackwell denied her leave to care for her father. Blackwell continued to get upset when appellant asked for time off to care for her father. Blackwell would tell her that she needed to leave her problems at home and suggested she put her father in a "home." Appellant said she retained the paperwork every time a request for leave was denied, however, one day she came to work and her desk was gone and she was ordered to get rid of the papers.

From October 2009 through the end of June 2010, appellant took the following days off to care for her father:

1. October 20 and 21, 2009, appellant took floating holidays.

2. October 24 and 25, 2009, appellant took vacation days.

3. December 16 and 19, 2009, appellant took sick days. On December 23, 2009, she took a personal holiday.

4. January 10, 2010, appellant took a sick day.

5

5. March 10, 2010, appellant took a sick day.

6. From May 8 to May 12, 2010, appellant took vacation days.

7. On June 29 and 30, 2010, appellant took sick days.

In 2010, the health of appellant's father further deteriorated. She requested two weeks of family medical leave in March 2010, but her request was denied. On March 10, she had to transport her father to the hospital, so she called in sick, despite Blackwell's instruction that she not do that. When she returned to work on March 13, 2010, she received a write-up for her work performance on March 9. The memorandum from Blackwell was dated March 10, 2010.

On March 25, 2010, appellant's father was admitted to hospice care with a terminal diagnosis of end stage Alzheimer's disease and a life expectancy of less than six months.

On April 19, 2010, Blackwell wrote-up appellant again, this time for failing to document another employee's suspected intoxication. Blackwell yelled loudly at appellant in front of her staff, and told her that he wanted her terminated, but Dinwiddie told him that he could not fire her.

On July 1, 2010, appellant submitted certification from her father's hospice provider that his death was imminent and he needed 24-hour care at home. The hospice provider requested that appellant be allowed time off to stay near her father on his death bed.

Appellant had previously requested days off for July 7, 2010, and July 24 and 25, 2010. Around this time, Blackwell asked appellant how her father was doing. When appellant responded that her father was not doing very well, Blackwell asked, "Why don't you take a couple of weeks off?" Appellant was surprised because normally Blackwell would give her a hard time about taking time off to be with her father. She found his suggestion to be "suspicious." Appellant recalled: "I didn't ask for these two weeks off. He voluntarily told me to take them." It was particularly strange because just days before, Boston had denied appellant's written request for time off. After her

6

unusual conversation with Blackwell, appellant was granted two weeks of family leave from July 10 through July 23, 2010.

**Respondent initiates cost-cutting measures**

Respondent's chief operating officer, Taro Ito (Ito), had become concerned about the overall financial state of the company. He recalled that every conversation he had with employees in the various departments was about how to save money and how to lower costs and become more efficient. These conversations were not directed specifically at the housekeeping department, but were universal. However, there was never a formalized plan to identify the areas in which the departments were to cut costs. Instead, Ito told everyone to look at his or her own department and see where cuts could be made. There was no specific dollar amount or percentage of overhead that was targeted. It was a general directive to cut operating costs. In early 2010, the possibility of layoffs was discussed at a directors meeting. However, there was no written policy nor were there any guidelines, for any such proposed layoffs. Instead, Ito would leave it up to the directors and staff to make recommendations regarding layoffs. He trusted that his directors knew their personnel and their duties and what they could or could not live without. There was no structured plan for a reduction in force. The general custom and practice of the company was last in, first out.

In the housekeeping department Blackwell looked at cutbacks in supply purchases and work hours. If an individual left, he would not rehire someone for that position. However, records show that the housekeeping department hired two employees in March 2010, two more in April 2010, one in May 2010, and two in June 2010.

Blackwell claims that he decided to terminate appellant sometime in May or June 2010, approximately two months before he actually fired her. He decided to recommend the elimination of appellant's position because she was earning the equivalent of $16 per hour to perform essentially the same tasks as housekeeping leads, who made only $10 per hour. Appellant was the only individual chosen by Blackwell to be terminated from housekeeping to cut costs. Blackwell did not inform appellant right away because he believed she was on leave at the time. When it was pointed out to him that appellant did

7

not go on leave until July, Blackwell stated he could not recall why he did not inform appellant of her termination in June. Although Blackwell claimed that he calculated the financial impact of appellant's termination, there were no discussions regarding the amount of any cost savings that could be achieved by terminating appellant, and Blackwell did not know the actual savings.

During appellant's July 2010 leave of absence, Terry Benton (Benton), a new hire in the housekeeping department was trained.

**Appellant's termination from employment**

There is conflicting evidence as to the precise events surrounding appellant's termination. Appellant claims that when she returned to work on July 26, 2010, after her family medical leave of absence, she was called into a meeting with Dinwiddie, Boston, and Blackwell. Blackwell did most of the talking, telling her they were letting her go and that her position was being discontinued. Appellant asked whose decision it was, and Blackwell said it was "all of us." Blackwell said, "Don't worry. We're going to call it a layoff. And that you can get your full benefits from unemployment." Appellant worked until the end of her shift on July 26, 2010, and that was the last day she performed any work for respondent. Appellant was 50 years old at the time of her termination.

Respondent's witness, Dinwiddie, tells a slightly different story. She says that the meeting at which appellant was informed of her termination took place on July 27, 2010. Respondent claims that appellant worked a full day on July 26, 2010, then was terminated when she came to work the next day. Dinwiddie also testified that she handed appellant a letter documenting appellant's termination. However, there is no testimony in the record from appellant that she received such a letter at the time of her termination. Respondent also claims that appellant was offered a demotion to lead housekeeper in lieu of the layoff. However, according to respondent, when appellant returned to turn in her uniform a day or two after her termination, she stated that she did not want to take the lesser position. Appellant denies that such an offer was ever made to her.

**Respondent outsources its housekeeping function**

In December 2010, Blackwell and an associate formed an entity called Direct Contract Services (DCS) for the sole purpose of providing housekeeping services to respondent. Respondent contracted out its housekeeping needs to DCS and transferred all of its housekeeping employees to DCS. Thus, had appellant's employment not been terminated, it would have been transferred to DCS.

**Other layoffs in 2010**

Respondent points to evidence that in 2010, it terminated 51 employees in a series of rolling layoffs. The layoffs included the elimination of five middle-management positions in addition to appellant's shift supervisor position: (1) security captain on July 20; (2) marketing manager on October 31; housekeeping supervisor (Boston's position) on December 26; (4) director of housekeeping (Blackwell's position) on December 26; and (5) food and beverage manager on December 28.[3] Of the 51 total employees who were laid off in 2010, 31 of them (61 percent) were 40 years old or older.

On or about September 10, 2010, Dinwiddie created a document called "Wage Reduction Cost Savings" to reflect the monetary savings that respondent had achieved by reducing staff and hours. The document reflected savings of $154,036.65 from the implementation of cost-cutting measures which included the elimination of appellant's position.

## PROCEDURAL HISTORY

Appellant filed her complaint against respondent and Blackwell on November 30, 2011. She alleged 11 causes of action: (1) race discrimination; (2) race discrimination and tortious termination in violation of public policy; (3) breach of implied-in-fact contract not to terminate without good cause; (4) discriminatory termination premised upon her CFRA leave request; (5) interference with her CFRA rights; (6) retaliatory

---

[3] Respondent declines to mention that Boston's and Blackwell's positions were eliminated as part of the outsourcing to DCS. Both individuals continued to be employed providing housekeeping services to respondent as part of DCS. In fact, Boston's title changed from lead supervisor to manager and she received a raise in pay.

termination for requesting and going on family care leave in violation of CFRA; (7) tortious termination and discrimination stemming from her CFRA leave request; (8) defamation; (9) intentional infliction of emotional distress; (10) age discrimination; and (11) declaratory relief.

Blackwell was dismissed from the case on July 20, 2012. On January 15, 2013, appellant voluntarily dismissed her first, second, third, eighth, ninth, and eleventh causes of action.

On February 22, 2013, respondent filed a motion for summary judgment, or in the alternative, motion for summary adjudication, as to appellant's remaining causes of action: CFRA interference (fifth cause of action); CFRA discrimination and retaliation (fourth, sixth, and seventh causes of action); and age discrimination (10th cause of action). On May 21, 2013, the trial court issued a written order granting respondent's motion in full. The court provided the following rationale for granting summary judgment on the remaining causes of action: as to the fourth cause of action for discriminatory termination under the CFRA, the sixth cause of action for retaliatory termination under the CFRA, the seventh cause of action for tortious termination and discrimination in violation of public policy, and the 10th cause of action for age discrimination, the trial court found that respondent offered a legitimate, nondiscriminatory reason for the action and appellant had not provided substantial evidence of pretext. As to the fifth cause of action for interference with appellant's rights and refusing her request for CFRA leave, the trial court found that appellant's evidence was extraneous to the essential elements of this cause of action.

On July 9, 2013, appellant filed her notice of appeal.

## DISCUSSION

### I. Standard of review

The standard of review for an order granting or denying a motion for summary judgment or adjudication is de novo. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 (*Aguilar*).) The trial court's stated reasons for granting summary relief are not

binding on the reviewing court, which reviews the trial court's ruling, not its rationale. (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878.)

A party moving for summary judgment "bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar, supra*, 25 Cal.4th at p. 850, fn. omitted.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Ibid.*, fn. omitted.) "A defendant bears the burden of persuasion that 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' thereto. [Citations.]" (*Ibid.*)

Generally, "the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact. . . . A prima facie showing is one that is sufficient to support the position of the party in question. [Citation.]" (*Aguilar, supra*, 25 Cal.4th at pp. 850-851.)

Under the standards set forth above, respondent was required to show that, as to each of appellant's causes of action, there was no triable issue of material fact and that respondent was entitled to judgment as a matter of law. The burden then shifted to appellant to show the existence of a triable issue of fact as to that cause of action. We examine appellant's causes of action below.

## II. The CFRA causes of action

### A. Applicable law

The CFRA prohibits covered employers from refusing to grant a request by an employee to take up to a total of 12 workweeks in any 12-month period for family care and medical leave. (Gov. Code, § 12945.2, subd. (a).) In addition, when an employee is granted family care or medical leave pursuant to the CFRA, the employer must provide the employee with a guarantee of employment in the same or a comparable position upon

the employee's return from leave. (*Ibid.*) Under the CFRA, an employee may take unpaid leave to care for a parent who has a serious health condition. (Gov. Code, § 12945.2, subd. (c)(3)(B).)[4]

The CFRA has a federal counterpart: the Family and Medical Leave Act of 1993. (29 U.S.C. §§ 2601-2654 (FMLA).) To the extent that they are not inconsistent with California law, the federal regulations interpreting the FMLA have been incorporated by reference into the law governing the CFRA. (Cal. Code Regs., tit. 2, § 11097.) "By prohibiting 'employment discrimination based upon family and medical leave, the CFRA strengthens the [California Fair Employment and Housing Act's (FEHA)] general goal of preventing the deleterious effects of employment discrimination, and also furthers the CFRA's specific goal of promoting stability and economic security in California families.' [Citation.]" (*Faust v. California Portland Cement Co.* (2007) 150 Cal.App.4th 864, 878 (*Faust*), fn. omitted.)[5]

The CFRA creates two categories of protections that are available to eligible employees. The first is an "interference claim," which is based on the employer's interference with an employee's rights under the CFRA. (*Faust, supra*, 150 Cal.App.4th at p. 879.) Such a violation "'simply requires that the employer deny the employee's entitlement to [CFRA] leave.' [Citation.]" (*Ibid.*) In seeking CFRA leave, the employee need not specifically invoke the CFRA or FMLA. Instead, the employee need only "state the reason the leave is needed." (Cal. Code Regs., tit. 2, § 11091.) The employer is permitted to inquire further if necessary "'to have more information about whether CFRA is being sought by the employee and obtain the necessary details of the leave to be taken.'" (*Faust*, at pp. 879-880.) The FMLA regulations interpret "interference" to

---

[4]     Respondent has not disputed appellant's entitlement to CFRA leave to care for her father.

[5]     Because the CFRA and the FMLA contain nearly identical provisions regarding family or medical leave, California courts routinely rely on federal cases interpreting the FMLA when reviewing the CFRA. (*Rogers v. County of Los Angeles* (2011) 198 Cal.App.4th 480, 487 (*Rogers*).)

include refusing the authorization of medical leave, discouraging the use of medical leave, and using the leave as a negative factor in employment actions.  (29 C.F.R. § 825.220; *Rogers, supra*, 198 Cal.App.4th at p. 488, fn. 3.)

The second category of protection guarantees that an employee who takes CFRA leave will not suffer adverse employment action.  In order to prove a prima facie case of CFRA retaliation or discrimination, the employee must show that:  (1) the employer was subject to the CFRA; (2) the employee was eligible for CFRA leave; (3) the employee exercised his or her right to take a qualifying leave; and (4) the employee suffered an adverse employment action because he or she exercised the right to take CFRA leave.  (*Rogers, supra*, 198 Cal.App.4th at pp. 490-491.)

### B.  Fifth cause of action for CFRA interference

Appellant alleges that respondent interfered with her CFRA rights by denying her CFRA when she asked for it; discouraging her from taking CFRA leave; misclassifying appellant's leave as vacation/sick leave; and failing to guarantee appellant's employment when she returned from leave.

In its summary judgment motion, respondent argued that there was no evidence that appellant's request for family medical leave was ever interfered with or denied.  Respondent argued that, while there was evidence that Blackwell denied appellant's requests for family and medical leave, Blackwell in fact did not have the authority to deny such requests.  Respondent argued that there is no evidence that Wady -- who was the only person authorized to deny such requests -- ever did so.

Respondent also argued that there was no evidence that appellant was ever disciplined for taking family medical leave.  Respondent pointed out that Blackwell's 2010 memorandum addressed customer complaints about the cleanliness of the women's restroom, not appellant's request for time off.

The trial court agreed with respondent, citing the following facts:

Fact 18:  "Plaintiff's managers, Blackwell and Boston, do not have the authority to approve family medical leave."

Fact 19: "[Respondent's] policy requires employees to use their paid vacation time before taking family medical leave."

Fact 29: "Wady advised [appellant] that she could get a medical certification to take family medical leave to care for her father so that she could take intermittent leave when needed."

Fact 32: "Wady approved [appellant's] medical certification for intermittent family medical leave."

Fact 44: "On July 5, [appellant] submitted a handwritten note to Boston that stated 'Yes I need time off. Two weeks to start. What do I have to do.'"

Fact 46: "On July 10, 2010, [appellant] submitted [respondent's] required leave request form for family medical leave that requested time off from July 10 to July 23, 2010, which was approved by Human Resources."

Fact 49: "[Appellant] alleges that there were certain dates during the September 2009 to July 2010 time period where Blackwell denied her request for family medical leave."

Fact 50: ["Appellant"] cannot recall specific occasions when her alleged requests were denied."

Fact 51: "After she was laid off, [appellant] filed an administrative charge with the Department of Fair Employment and Housing Act where she identified Blackwell as the individual who allegedly denied her family medical leave requests."

The court cited these facts in support of its decision that "There's no showing of a refusal of the CFRA." The court further stated: "[Appellant] waves the flag very loudly about other facts and other denials, but a lot of that is just extraneous to the essential elements of these particular causes of action."

We note that, of the nine facts listed by the trial court, six of them, Facts 18, 32, 46, 49, 50, and 51, were listed as "disputed" in appellant's separate statement. For example, appellant disputed respondent's statement that Blackwell and Boston do not have the authority to approve family medical leave, citing deposition testimony of Boston, Wady, Blackwell, and Dinwiddie which suggested that if an employee in the

14

housekeeping department still had remaining vacation time, and was requesting less than 30 days off, those requests would be approved or denied by Blackwell or Boston. Appellant also cited evidence that even if the employee had no remaining available vacation time or was requesting more than 30 days leave, the request would initially have to be approved by Blackwell or Boston, and it would be the responsibility of Blackwell or Boston to bring the request to human resources.

Appellant also disputes respondent's statement that she could "[not] recall specific occasions when her alleged requests were denied." To the contrary, appellant testified that she recalled 10 separate instances when Blackwell denied her FMLA/CFRA leave. For example, she asked for two weeks of leave in March 2010 but was denied.

Generally, there exists a triable issue of material fact if the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion. (*Aguilar, supra*, 25 Cal.4th at p. 850.) This is not a heavy burden. In sum, appellant is only required to make a prima facie showing in support of her position. (*Ibid.*) We find that appellant has made such a showing.

There is no dispute that respondent is a qualified employer and that appellant met the criteria for entitlement to CFRA leave. There is also no dispute that she provided respondent with a medical certification from her father's doctor explaining the reasons for her need for family medical leave. And appellant provided testimony that her supervisors interfered with her right to take CFRA leave. She was told that she could not take unpaid CFRA time until she exhausted her vacation time, and it was her supervisors, Blackwell and Boston, who approved vacation time. [6] Appellant explained that when she

_____

**6** Respondent insists that it never denied appellant's requests to take CFRA leave because appellant neglected to fill out the appropriate request for CFRA leave along with the various vacation and floating holiday requests that she made directly to Blackwell and Boston. In sum, respondents argue that they "granted every request for family medical leave that [appellant] chose to characterize as such." However, appellant's failure to specifically invoke the CFRA is not fatal to her claims. Instead, she need only have informed her supervisors of the reason that she wanted to take the time off. (Cal. Code Regs., tit. 2, § 11091.) Appellant testified that she did so.

15

would take time off, she would get written up for something. Her supervisor told her "You're taking too much time off. We don't have the staff for it." After she submitted her formal certification for family medical leave, she was occasionally granted time off but she could specifically recall at least 10 instances when Blackwell denied her leave to care for her father. Blackwell would get upset when she asked for leave to take care of her father, and suggested that she put her father in a "home." In particular, appellant requested two weeks off in March 2010, but her request was denied. On the tenth of March, she had to transport her father to the hospital so she called in sick. When she got back, she had been written up for her performance.

This evidence is sufficient to create a triable issue of fact as to whether respondent interfered with appellant's CFRA rights. At the summary judgment stage of the proceedings, appellant has only a burden of producing evidence to make a prima facie showing of the existence of a triable issue of material fact. Significantly, this is a burden of production, not a burden of persuasion. (*Aguilar, supra*, 25 Cal.4th at p. 850 ["A burden of production entails only the presentation of 'evidence.'. . . A burden of persuasion, however, entails the 'establish[ment]' through such evidence of a 'requisite degree of belief'"].) Appellant has produced sufficient evidence, mainly through her own testimony, that respondent denied her entitlement to CFRA leave; discouraged her from taking CFRA leave; and/or took adverse employment action against her for taking CFRA leave. Under the circumstances, summary judgment on appellant's cause of action for CFRA interference was improper.[7]

---

[7] After briefing was complete in this matter, respondent drew our attention to new authority regarding appellant's interference claim. The case *Escriba v. Foster Poultry Farms, Inc.* (9th Cir. 2014) 743 F.3d 1236, involved an employee who was terminated after failing to comply with her employer's "'three day no-show, no-call'" rule after a previously approved period of leave to care for her father in Guatemala. Significantly, the appeal was from a judgment after a jury trial. The parties disputed whether the plaintiff chose to characterize her request for time off as FMLA. The employer, Foster Farms, argued that although the plaintiff provided an FMLA-qualifying reason for taking leave, "she explicitly declined to have her time off count as FMLA leave." (*Id.* at p. 1239.) "The district court characterized the case as a classic 'he said, she said' matter

***C. Fourth cause of action for discriminatory termination in violation of CFRA; sixth cause of action for retaliatory termination in violation of CFRA; and seventh cause of action for tortious termination in violation of public policy***

Appellant's causes of action for discriminatory and retaliatory termination will be discussed together. All three causes of action generally allege wrongful termination on the basis of appellant's exercise of her CRFA rights.

"When a plaintiff alleges retaliatory employment termination either as a claim under FEHA or as a claim for wrongful employment termination in violation of public policy, and the defendant seeks summary judgment, California follows the burden-shifting analysis of *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 (*McDonnell Douglas*) to determine whether there are triable issues of fact for resolution by a jury. [Citation.]" (*Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1108-1109 (*Loggins*).)

"In the first stage, the 'plaintiff must show (1) he or she engaged in a "protected activity," (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action.' [Citation.] If the employee successfully establishes these elements and thereby shows a prima facie case exists, the burden shifts to the employer to provide evidence that there was a legitimate, nonretaliatory reason for the adverse employment action. [Citation.] If the employer produces evidence showing a legitimate reason for the adverse employment action, 'the presumption of retaliation """drops out of the picture,"""' [citation], and the burden shifts back to the employee to provide 'substantial responsive evidence' that the employer's proffered reasons were untrue or pretextual. [Citation.]" (*Loggins, supra*, 151 Cal.App.4th at p. 1109.)

---

focused on what Escriba told her supervisors. Escriba's claims therefore proceeded to a jury trial . . . ." (*Ibid.*) This new authority thus supports our conclusion that a jury determination is required for the factual questions in this case, such as what appellant communicated to her supervisors, and whether they were aware that she wanted to take CFRA leave.

The parties accept, and the trial court implicitly found, that appellant met the first two elements of these causes of action: (1) she engaged in a protected activity, which was her exercise of her right to take family medical leave; and (2) she was subjected to an adverse employment action, her termination from employment. The trial court implicitly found that appellant made a prima facie showing of a causal connection between the protected activity and the employer's action, but held that respondent offered a legitimate, nondiscriminatory reason for the adverse employment action and that appellant did not provide substantial evidence of pretext.

### 1. Appellant's prima facie case

As set forth above, it is undisputed that appellant was eligible for CFRA leave. Appellant has also provided evidence that she exercised her right to take CFRA leave. Appellant's exercise of her right to take family medical leave is a protected activity, thus appellant has established this first element of her CFRA discrimination/retaliation claims.

In addition, in July 2010, appellant's employment was terminated. This constituted an adverse employment action. Thus, appellant has established this element of her prima facie case.

Respondent argues that appellant cannot meet the requirement that she establish a causal link between her protected activity and the adverse employment action. Respondent acknowledges that very close proximity in time between the protected activity and the adverse employment action can support an inference that the adverse employment action was caused by the protected activity. (*Clark County School Dist. v. Breeden* (2001) 532 U.S. 268, 273-274 ["The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close'"].) However, respondent argues that temporal proximity should be measured from the date that appellant requested intermittent CFRA leave, in September 2009. When analyzed from this point in time, respondent points out, eight months passed between appellant's request and the decision to terminate her in May 2010. Two additional months passed before her position was

eliminated in July 2010. Respondent argues that this eight- to ten-month period precludes a reasonable fact finder from concluding that a causal connection existed between the two events.

Respondent cites no authority for its position that "the proper temporal proximity analysis requires an examination of the amount of time between the date the protected activity began (i.e., the date she requested CFRA leave) and the date of her adverse employment action." There is no legal support for respondent's position that a request for family medical leave is only protected at the point in time when the employee initially requests the leave.

Taking CFRA leave -- not simply requesting CFRA leave -- is a protected activity. The evidence shows that appellant took formal CFRA leave in July 2010 and was terminated the day she returned to work.[8] Considering that appellant had been employed for 12 years, we find that appellant has established sufficient proximity in time between the protected activity and her termination.

In addition, appellant has presented evidence that her supervisors were unhappy with her requests to take time off to care for her father. Appellant testified that she was told that she was taking too much time off and that respondent didn't have the staff for it. She indicated that it was a "fight" to take time off. In sum, there is evidence that appellant's superiors were unhappy that appellant was exercising her rights under CFRA.

This evidence is sufficient to establish a triable issue of material fact as to whether there exists a causal connection between appellant's protected activity and the adverse employment action. We therefore conclude that appellant succeeded in establishing a prima facie case of discriminatory and retaliatory termination under CFRA and the public policies that underlie the statute.

---

[8] We acknowledge that there is a factual conflict as to whether she was terminated the day she returned to work, July 26, 2010, or the following day, July 27, 2010. This factual dispute does not change the analysis.

19

## 2. Legitimate, nonretaliatory reason

Because appellant has set forth a prima facie case of discriminatory/retaliatory termination in violation of CFRA, the burden shifts to respondent to present a legitimate, nonretaliatory reason for the adverse employment action. (*Loggins, supra*, 151 Cal.App.4th at p. 1109.)

We find, as the trial court did, that respondent has met this burden. Respondent provided evidence that its chief operating officer, Ito, became concerned about the financial state of the company and initiated discussions with his employees about how to lower costs. He issued a general directive to all the departments to cut operating costs. In early 2010, at a directors meeting, layoffs were discussed. Ito left it up to the directors and staff to make recommendations regarding layoffs.

Blackwell testified that he decided to terminate appellant's employment sometime in May or June 2010. He testified that his decision was based on the fact that appellant was earning the equivalent of $16 per hour to perform essentially the same tasks as housekeeping leads, who were making $10 per hour. Blackwell stated that his decision to cut appellant's position was solely for cost cutting.

On the basis of this evidence, we find that respondent has met its burden of producing a legitimate, nonretalitatory/nondiscriminatory reason for appellant's termination.

## 3. Pretext

Because respondent has set forth a legitimate reason for appellant's termination, the burden shifts back to appellant "to provide 'substantial responsive evidence' that the employer's proffered reasons were untrue or pretextual. [Citation.]" (*Loggins, supra*, 151 Cal.App.4th at p. 1109.) However, appellant need not show that discrimination or retaliation was the sole or determinative reason for the adverse action, but rather that it was one of the reasons. (See, e.g., *Heard v. Lockheed Missiles & Space Co.* (1996) 44 Cal.App.4th 1735, 1748 ["In some cases, the evidence will establish that the employer had 'mixed motives' for its employment decision. [Citation.] In a mixed motive case, both legitimate and illegitimate factors contribute to the employment decision"].)

20

"It is not enough for the employee simply to raise triable issues of fact concerning whether the employer's reasons for taking the adverse action were sound." (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005 (*Hersant*).) This is because it is not the employer's wisdom that is in controversy, but the employer's possible improper motivation. Thus, in order to successfully raise the question of pretext, appellant must set forth specific facts demonstrating "'such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," [citation] . . . . [Citations.]' [Citations.]" (*Ibid.*) In short, appellant must set forth evidence of a "'discriminatory animus.'" (*Ibid.*)

Appellant sets forth several such inconsistencies or implausibilities which are sufficient to create a question as to whether the motivation behind her termination was permissible. Blackwell admitted that appellant was the only employee terminated in the housekeeping department for alleged cost-cutting. In addition, records show that the housekeeping department hired six new employees from March through June 2010. Significantly, there was evidence that one of these new hires, Benton, was being trained during the time that appellant was out on CRFA leave in July 2010. Benton ultimately took over some of appellant's job duties. Blackwell did not have any discussions with anyone regarding the amount of cost savings that would result from appellant's termination, and he did not know the actual savings that resulted from her termination.

These facts are inconsistent with Blackwell's position that appellant was terminated due to cost cutting. It is contradictory for an employer to state that it is terminating an individual's job for cost cutting when it has hired several new employees within the same time period as the individual's termination. And Blackwell's failure to take into account the precise cost savings of appellant's termination presents a weakness in respondent's defense. Respondent's position would be more plausible if a financial analysis had been undertaken prior to appellant's termination.

Appellant also offered direct testimony that her supervisors were unhappy with her attempts to exercise her right to take CFRA leave. Blackwell's comments that she was

21

taking too much time off, and that she should put her father in a home, are evidence of a discriminatory animus which would allow a reasonable fact finder to determine that respondent's proffered legitimate reasons are unworthy of credence.

In addition to these weaknesses and inconsistencies in respondent's position, we may consider the timing of appellant's termination. While temporal proximity alone is insufficient to establish pretext, it may be considered as evidence of pretext along with other factors. (*Loggins, supra*, 151 Cal.App.4th at p. 1112; *Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 353-354 ["This is not to say that temporal proximity is never relevant in the final step of the *McDonnell Douglas* test. In the classic situation where temporal proximity is a factor, an employee has worked for the same employer for several years, has a good or excellent performance record, and then, after engaging in some type of protected activity . . . is suddenly accused of serious performance problems, subjected to derogatory comments about the protected activity, and terminated. In those circumstances, temporal proximity, *together* with *other* evidence, may be sufficient to establish pretext"].) As set forth above, appellant's termination occurred either her first day or her second day back from CFRA leave. Regardless of which specific day appellant was terminated, this sequence of events satisfies the requirement that "'temporal proximity must be very close.'" (*Arteaga, supra*, at p. 354.)

"[W]e may not decide factual issues on summary judgment but may only identify the presence or absence of factual issues. [Citation.]" (*Loggins, supra*, 151 Cal.App.4th at p. 1110.) We find that the evidence set forth above is sufficient to create a triable issue of fact as to pretext. A reasonable juror might conclude that respondent's stated reason for terminating appellant was pretextual, and was used as an excuse to terminate appellant's employment due to the fact that she was exercising her right to take CFRA leave. As noted in *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 286 (*Nazir*), "many employment cases present issues of intent, and motive, and hostile working environment, issues not determinable on paper. Such cases, we caution, are rarely appropriate for disposition on summary judgment, however liberalized it be." (Fn. omitted.) We conclude that due to the abundance of factual controversies regarding

22

respondent's motive in terminating appellant's employment, summary judgment of these CFRA-based causes of action must be reversed.

### D. *Tenth cause of action for age discrimination*

Generally, a plaintiff alleging age discrimination must provide evidence that: (1) she was a member of a protected class; (2) she was performing competently in the position that he held; (3) she suffered an adverse employment action; and (4) some other circumstance suggesting a discriminatory motive for the adverse employment action. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355.) As to the fourth element of this cause of action, the plaintiff must show that she suffered the adverse action "under circumstances that give rise to an inference of unlawful discrimination, i.e., evidence that the plaintiff was replaced by someone significantly younger than the plaintiff. [Citation.]" (*Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 321 (*Sandell*), fn. omitted.)

#### 1. Applicable legal analysis

We must first address the proper analytical framework for appellant's age discrimination claim. Appellant argues that where there is direct evidence of discrimination, the *McDonnell Douglas* test is inapplicable. In support of this argument, appellant cites *TWA. v. Thurston* (1985) 469 U.S. 111, 121 (*TWA*) ["the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination"].)

We find *TWA* to be factually distinguishable. There, the defendant had a policy which was discriminatory on its face (*TWA, supra*, 469 U.S. at p. 121) which was direct evidence of age discrimination. No such evidence is present in this case. No one has admitted to terminating appellant due to her age, nor did respondent have a policy in place which was discriminatory on its face. Instead, the fact finder must attempt to determine respondent's motive and intent from inference and presumption. (See *Godwin v. Hunt Wesson, Inc.* (9th Cir. 1998) 150 F.3d 1217, 1221 ["'Direct evidence is evidence which, if believed, proves the fact [of retalitatory animus] without inference or presumption'"].)

Appellant argues that "Comments demonstrating discriminatory animus may be found to be direct evidence if there is evidence of a causal relationship between the comments and the adverse job action at issue. [Citation.]" (*DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 550.) The comments at issue in *DeJung* were a presiding judge's comments to an applicant for a full-time commissioner position that "'they want someone younger, maybe in their 40's.'" (*Id.* at pp. 540-541.) The Court of Appeal concluded, "if a jury believed that [the presiding judge] made the comments attributed to him by DeJung and Rigg, [the] statements would plainly qualify as direct evidence of discriminatory animus." (*Id.* at p. 550.)

Again, no such evidence exists in this case. No supervisor commented that they were looking for someone younger to take appellant's position. Instead, the evidence here is circumstantial, and the *McDonnell Douglas* test is appropriate to determine if summary judgment was appropriate. We therefore engage in the same burden-shifting analysis as set forth above in connection with appellant's CFRA causes of action.

### 2. Appellant's prima facie case

A plaintiff is in a protected class for purposes of an age discrimination lawsuit if he or she is over the age of 40. (*Hersant, supra*, 57 Cal.App.4th at p. 1003.) Appellant was 50 years old at the time of her termination from employment. Therefore she has established that she was a member of a protected class for the purposes of her age discrimination claim. In addition, respondent does not dispute that appellant performed competently and suffered an adverse employment action, which was her termination in July 2010.

Appellant has presented evidence that after she was terminated, appellant was replaced by significantly younger employees. Dinwiddie attested to the fact that after appellant left respondent's employ, her duties were taken over by four employees: Boston, who was 47 years old at the time, housekeeping lead Cedric Outlaw, who was 44 years old at the time, housekeeping lead Benton, who was 24 years old at the time, and Stephanie Greene, who was 29 years old at the time. Notably, all of these employees were younger than appellant. Appellant provided evidence that the 24-year-old Benton

24

was being trained to take over some of appellant's duties during the time of appellant's CFRA leave of absence. This evidence creates an inference that the much younger Benton was being trained to replace appellant. Evidence that the plaintiff was replaced by a significantly younger person is sufficient to create a prima facie case of age discrimination where all the other elements of the violation are met. (*Hersant, supra*, 57 Cal.App.4th at p. 1003.)

In addition, Blackwell admitted that he fired appellant because, due to her seniority, she was making more money than other employees performing the same tasks. Such an admission provides evidence that there may have been a discriminatory motive for appellant's firing. For example, in *Sandell*, a manager was heard to say he would "'rather fire old people and replace them with newer, younger people because it was cheaper.'" (*Sandell, supra*, 188 Cal.App.4th at p. 325.) The Court of Appeal stated: "We must accept the most favorable interpretation of the evidence for purposes of the summary judgment motion. A reasonable inference from this . . . evidence is that Taylor was motivated to terminate employees because of their age." (*Ibid*.) Similarly, here, we must accept the favorable interpretation of Blackwell's admission, and assume that appellant was targeted because as an older employee, she was making more money than younger, newer employees performing the same tasks.

The California Legislature has expressed a general policy that laying off older workers because of the increased salary to which they have become entitled is discriminatory. Government Code section 12941 states in part: "The Legislature declares its intent that the use of salary as the basis for differentiating between employees when terminating employment may be found to constitute age discrimination if use of that criterion adversely impacts older workers as a group . . . . The Legislature further reaffirms its intent that the courts interpret the state's statutes prohibiting age discrimination in employment broadly and vigorously." Blackwell's stated reason for

25

terminating appellant may be interpreted as an improper and discriminatory rationale. We must interpret the statement in a light most favorable to appellant.[9]

Finally, appellant presents evidence that Blackwell referred to appellant as "slow," "old," and "laxadasy [*sic*]." When appellant requested to work the first shift, Blackwell informed her that she would never work the first shift because she was slow. He stated that the people who worked appellant's shift were not "the sharpest knives in the cabinet." Such comments may be interpreted as expressing a negative attitude towards older workers, and may constitute circumstantial evidence of discrimination. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 540 ["even if age-related comments can be considered stray remarks because they were not made in the direct context of the decisional process, a court should not categorically discount the evidence if relevant; it should be left to the fact finder to assess its probative value"].)

The evidence set forth above is sufficient to create a prima facie case of wrongful termination based on age discrimination.

### 3. Legitimate, nonretaliatory reason

Because appellant has set forth a prima facie case of age discrimination, the burden shifts to respondent to present a legitimate, nonretaliatory reason for the adverse employment action. (*Loggins, supra*, 151 Cal.App.4th at p. 1109.)

Again we find, for the same reasons set forth above as to appellant's retaliation/ discrimination for violation of her rights under CFRA, that respondent has met this burden. Respondent provided evidence that its chief operating officer, Ito, became concerned about the financial state of the company and initiated discussions with his

---

[9]     Respondent argues that there was no evidence that the 2010 layoffs disproportionately affected employees over the age of 40. Respondent points to evidence that in 2010, 69 percent of its employees were age 40 or older. Of the 51 employees who were laid off in 2010, only 31 (61 percent) were age 40 or older. Thus, respondent argues, the percentage of the workforce over the age of 40 actually increased after the layoffs. This evidence supports respondent's position, but does not eliminate a factual dispute over the reasons for appellant's termination in particular. A reasonable jury could find that only appellant's department, or only appellant's supervisors, had the requisite discriminatory animus.

employees about how to lower costs. He issued a general directive to all the departments to cut operating costs. In early 2010, at a directors meeting, layoffs were discussed. Ito left it up to the directors and staff to make recommendations regarding layoffs.

Blackwell testified that he decided to terminate appellant's employment sometime in May or June 2010. He testified that his decision was based on the fact that appellant was earning the equivalent of $16 per hour to perform essentially the same tasks as housekeeping leads, who were making $10 per hour. Blackwell stated that his decision to cut appellant's position was solely for cost cutting. Blackwell's stated reason for appellant's termination could be interpreted by a fact finder as impartial and objective.

On the basis of this evidence, we find that respondent has met its burden of producing a legitimate, nonretalitatory/nondiscriminatory reason for appellant's termination.

### 4. Pretext

Because respondent has set forth a legitimate reason for appellant's termination, the burden shifts back to appellant "to provide 'substantial responsive evidence' that the employer's proffered reasons were untrue or pretextual. [Citation.]" (*Loggins, supra*, 151 Cal.App.4th at p. 1109.)

We find that much of the same evidence which casts into doubt the legitimate, nonretaliatory rationale stated by respondent in connection with the CFRA claims also shows evidence of pretext in the context of appellant's age discrimination claim. As set forth above, Blackwell admitted that appellant was the only employee terminated in the housekeeping department for alleged cost cutting. In addition, records show that the housekeeping department hired six new employees from March through June, 2010. Significantly, there was evidence that one of these new hires, Benton, was being trained during the time that appellant was out on CRFA leave in July 2010. Blackwell did not have any discussions with anyone regarding the amount of cost savings that would result from appellant's termination, and he did not know the actual savings that resulted from her termination.

27

Furthermore, the evidence of Blackwell's stray derogatory remarks may be considered evidence of discriminatory animus. And finally, appellant provided evidence that respondent had a general policy that employees would be terminated on a "last in, first out" basis. The termination of appellant could be interpreted as a departure from that policy. Respondent had employed appellant since 1998, and she had received promotions and raises during the 12 years she worked for respondent.[10] Yet she was terminated before other housekeeping employees hired after her. Departure from normal procedures "might afford evidence that improper purposes [played] a role" in appellant's termination. (*Village of Arlington Heights v. Metropolitan Housing Development Corp.* (1977) 429 U.S. 252, 267.)

We find that this evidence is sufficient to create a triable issue of fact as to pretext in connection with appellant's age discrimination claim. A reasonable juror might find that respondent's stated reason for terminating appellant was pretextual, and that respondent was instead motivated by a discriminatory purpose. Such issues of intent and motive are not appropriate for disposition on summary judgment. (*Nazir, supra*, 178 Cal.App.4th at p. 286.) We conclude that summary judgment of appellant's 10th cause of action for age discrimination must be reversed.

---

[10] Respondent argues that its seniority policy had no application to appellant because she was the only shift supervisor employed in 2010. Thus, according to respondent, there was no shift supervisor with fewer years experience than appellant. Respondent's argument is based on an interpretation of the facts which should be left to the jury. We cannot decide on the record before us that respondent followed its last in, first out policy as a matter of law.

A reasonable fact finder could find that because there were other employees in the housekeeping department with fewer years experience than appellant, those employees should have been laid off first, even if appellant had to be moved to a different position. The question of whether appellant was offered a lesser position in lieu of termination is vigorously disputed. On summary judgment, we must interpret the facts favorably to appellant. (*Aguilar, supra*, 25 Cal.4th at p. 850.)

28

**DISPOSITION**

The judgment is reversed and remanded for further proceedings on appellant's fourth, fifth, sixth, seventh, and tenth causes of action. Appellant is awarded costs of appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
CHAVEZ

We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.*
FERNS

_____
* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.